**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MRS. CONNIE MEGGS;<br>MR. KELLY MEGGS, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )  Case No. 1:22-cv-00005-CJN |
| | ) |
| NANCY PELOSI, *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
<u>**MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................2

      A.     The January 6th Attack..........................................................................2

      B.     The Formation of the Select Committee ...................................................6

      C.     The Select Committee's Subpoena to Verizon .........................................7

STANDARD OF REVIEW ..........................................................................................8

ARGUMENT ................................................................................................................8

I.     The Select Committee Has a Valid Legislative Purpose and Is Validly Constituted .................................................................................................8

II.    The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena ........................................................................................14

III.   Plaintiffs' Marital Privilege Claim Fails ...........................................................17

IV.   Plaintiffs Fail to State a Proper Constitutional Challenge to the Subpoena ..........19

      A.     The Subpoena Does Not Violate Plaintiffs' First Amendment Rights.......19

      B.     The Subpoena Does Not Violate Plaintiffs' Fourth Amendment Rights .................................................................................................21

      C.     The Subpoena Does Not Violate Plaintiffs' Sixth Amendment Rights......22

CONCLUSION ...........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009) ................................................................................................7

*Austin v. United States,*
　509 U.S. 602 (1993) ..............................................................................................22

*Barker v. Conroy,*
　921 F.3d 1118 (2019) ............................................................................................13

*Barenblatt v. United States,*
　360 U.S. 109 (1959) ..............................................................................................19

*Bell Atl. Corp. v. Twombly,*
　550 U.S. 544 (2007) ................................................................................................8

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO,*
　860 F.2d 346 (9th Cir. 1988) ................................................................................20

*Buckley v. Valeo,*
　424 U.S. 1 (1976) ..................................................................................................20

*Burnap v. United States,*
　252 U.S. 512 (1920) ..............................................................................................16

*Cellco P'ship v. FCC.,*
　357 F.3d 88 (D.C. Cir. 2004) ................................................................................10

*Digital Realty Tr., Inc. v. Somers,*
　138 S. Ct. 767 (2018) ............................................................................................15

*Eastland v. U.S. Servicemen's Fund,*
　421 U.S. 491 (1975) ........................................................................................19, 21

*Exxon Corp. v. F.T.C.,*
　589 F.2d 582 (D.C. Cir. 1978) ..............................................................................22

*Gutierrez de Martinez v. Lamagno,*
　515 U.S. 417 (1995) ..............................................................................................11

*Hubbard v. United States,*
　514 U.S. 695 (1995) ........................................................................................15, 16

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................................................9

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ..............................................................................................20

*LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*,
    347 F.3d 315 (D.C. Cir. 2003) ...............................................................................10

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ................................................................................................9

*McPhaul v. United States*,
    364 U.S. 372 (1960) ..........................................................................................21, 22

*Pereira v. United States*,
    347 U.S. 1 (1954) ...............................................................................................17, 18

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) ...........................................................................9

*Senate Permanent Subcommittee on Investigation v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016) ........................................................................19

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ..............................................................................11

*Trump v. Deutsche Bank AG*,
    943 F.3d 627 (2d Cir. 2019) ...................................................................................16

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ...........................................................................................16

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) .....................................................................1, 5, 8, 9, 21

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ................................................................................12

*United States v. Bolzer*,
    556 F.2d 948 (9th Cir. 1977) ..................................................................................17

*United States v. Chem. Found., Inc.*,
    272 U.S. 1 (1926) ...................................................................................................11

*United States v. Lewis*,
    433 F.2d 1146 (D.C. Cir. 1970) ..............................................................................17

*United States v. Marashi*,
    913 F.2d 724 (9th Cir. 1990) ...........................................................................17, 18

*Vander Jagt v. O'Neil*,
    699 F.2d 1166 (D.C. Cir. 1982) .......................................................................10, 13

*Watkins v. United States*,
    354 U.S. 178 (1957)................................................................................................17

## <u>Constitutional & Legislative Authorities</u>

8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172.............................12

18 U.S.C. § 2 ...................................................................................................................3

18 U.S.C. § 6 ...........................................................................................................15, 16

18 U.S.C. § 372 ...............................................................................................................3

18 U.S.C. § 1361 .............................................................................................................3

18 U.S.C. § 1512 .............................................................................................................3

18 U.S.C. § 1752 .............................................................................................................3

18 U.S.C. § 2701 *et seq.*................................................................................................13

    18 U.S.C. § 2702..................................................................................................14, 15

    18 U.S.C. § 2703..................................................................................................14, 17

    18 U.S.C. § 2711.......................................................................................................15

    18 U.S.C. § 2712.......................................................................................................16

26 U.S.C. §§ 8001-8005 .................................................................................................10

167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) ...................................10, 12

H. Rep. No. 109-377, 109th Cong. (2006)......................................................................11

H. Res. 6, 116th Cong. (2019) ........................................................................................12

H. Res. 24, 110th Cong. (2007) ......................................................................................12

H. Res. 437, 109th Cong. (2005) ....................................................................................11

H. Res 503, 117th Cong. (2021) ..............................................................3, 6, 11, 12, 21

H. Res. 730, 117th Cong. (2021) ........................................................................12, 13

H. Res. 851, 117th Cong. (2021) ........................................................................11, 13

Rules of the House of Representatives, 117th Cong. (2021)

    Rule X ................................................................................................................10

    Rule I .................................................................................................................12

U.S. Const., Art. I, § 5 ..............................................................................................9

## **Other Authorities**

Black's Law Dictionary (11th ed. 2019)....................................................................12

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement
    about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021),
    https://perma.cc/4JNC-73R2.............................................................................6

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement
    on Republican Recommendations to Serve on the Select Comm. to Investigate
    the Jan. 6 Attack on the U.S. Capitol (July 21, 2021),
    https://www.speaker.gov/newsroom/72121-2 ("Pelosi Press Release") ...................................6

## INTRODUCTION

This lawsuit is yet another attempt to prevent a lawfully constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *injunction denied*, 142 S. Ct. 680 (2022), *cert. denied*, No. 21-932 (Feb. 22, 2022).

Plaintiffs Kelly and Connie Meggs, affiliates of the Oath Keepers paramilitary group, participated in the assault on the United States Capitol on January 6, 2021.  After information about Plaintiffs' involvement in the storming of the Capitol and the planning of the events surrounding that day came to light, the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) issued a subpoena to Verizon Communications Inc. seeking subscriber information, connection records, and records of session times and durations of calls for the three months surrounding January 6, 2021 for phone numbers associated with Plaintiffs' Verizon account (the subpoena did not seek the content of any calls nor any geo-location information).  Plaintiffs now ask this Court to enjoin enforcement of that subpoena and to declare the Select Committee invalid.  Supreme Court and Circuit precedent, along with long-established constitutional principles, compel rejection of these claims.

*First*, Plaintiffs are wrong that the Select Committee lacks a legitimate legislative purpose or is invalidly constituted.  Every court that has considered these arguments has rejected them.  *Second*, the Stored Communications Act does not restrict the Select Committee's lawful subpoena seeking non-content information.  *Third*, Plaintiffs' marital privilege claim does not shield from the Select Committee the information encompassed by the subpoena.  Finally, none of Plaintiffs' First, Fourth, or Sixth Amendment rights are violated by the subpoena.

In short, the Complaint presses a variety of flawed legal claims to thwart the Select Committee's efforts to understand fully, and to prevent a recurrence of, the events of January 6th.  The Court should dismiss the Complaint in its entirety.

## BACKGROUND

Plaintiffs Kelly and Connie Meggs are affiliated with the Oath Keepers, a "large but loosely organized collection of individuals, some of whom are associated with militias," and are currently facing criminal charges relating to January 6, 2021.  Indictment at 3, *USA v. Rhodes, III*, No. 1:22-cr-00015 (D.D.C. Jan. 12, 2022), ECF 1; Seventh Superseding Indictment at 3, *USA v. Caldwell*, No. 1:21-cr-00028 (D.D.C. Jan. 12, 2022), ECF 583.[1]  According to recent court filings, some Oath Keepers "believe that the federal government has been coopted by a cabal of elites actively trying to strip American citizens of their rights."  Indictment at 3, No. 1:22-cr-00015, ECF 1; Seventh Superseding Indictment at 3, No. 1:21-cr-00028, ECF 583.  After the 2020 Presidential election, the Oath Keepers scheduled and attended military-style and combat trainings.  *See* Order at 3, *USA v. Caldwell*, No. 1:21-cr-00028 (D.D.C. Dec. 20, 2021), ECF 558.  They also collected "paramilitary gear and supplies—including firearms, camouflaged combat uniforms, tactical vests with plates, helmets, eye protection, and radio equipment[.]"  *Id.* at 3 (citation omitted).

### A.      The January 6th Attack

On January 6, 2021, violent rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a violent assault on the United States Capitol.

---

[1] The Select Committee is not charged with developing or prosecuting criminal cases, but it is investigating the attack on the U.S. Capitol and the surrounding events and causes.  Some of the Department of Justice's criminal investigations into the attack have publicly revealed evidence directly demonstrating the relevance of the subpoenaed records to the Select Committee's separate investigation.

H. Res. 503, 117th Cong. (2021), Preamble.  Rioters attacked police, breached the Capitol, and obstructed and impeded the electoral vote.

Plaintiffs were among those who planned the events and entered the Capitol that day. Kelly Meggs has been charged with: seditious conspiracy in violation of 18 U.S.C. § 2384; conspiracy to obstruct an official proceeding in violation of 18 U.S.C. 1512(k); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) and aiding and abetting the same, *see* 18 U.S.C. § 2; conspiracy to prevent an officer from discharging any duties in violation of 18 U.S.C. § 372; destruction of government property, in violation of 18 U.S.C. § 1361 and aiding and abetting the same, *see* 18 U.S.C. § 2; and tampering with documents or proceedings in violation of 18 U.S.C. § 1512(c)(1) and aiding and abetting the same, *see* 18 U.S.C. § 2 (counts 1, 2, 3, 4, 5, and 10).  Indictment at 8-36, 41, No. 1:22-cr-00015, ECF 1.  Connie Meggs has been charged with: conspiracy to obstruct an official proceeding in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) and aiding and abetting the same, *see* 18 U.S.C. § 2; conspiracy to prevent an officer from discharging any duties in violation of 18 U.S.C. § 372; destruction of government property in violation of 18 U.S.C. § 1361 and aiding abetting the same, *see* 18 U.S.C. § 2; and knowingly entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) (counts 1, 2, 3, 4, and 5).  Seventh Superseding Indictment at 10-28, No. 1:21-cr-00028, ECF 583.

According to the United States' filings in his pending criminal case, Kelly Meggs "plotted with his co-conspirators to stop the certification of the Electoral College vote, prepared to use violence if necessary, and stormed the Capitol.  And he was the 'team leader' of the attack."  Gov't Opp'n to Def.'s Renewed Req. for Pretrial Release at 1, *USA v. Meggs*, No. 1:21-cr-00028 (D.D.C. March 23, 2021), ECF 98 (Gov't Opp'n).  He gave an instruction to "wait for

the 6th when we are all in DC to insurrection." *Id.* at 10.  After traveling to Washington, D.C.,

Kelly Meggs paid for two rooms (each for two people) at the Comfort Inn Ballston from January

5 through 6, 2021.  Indictment at 16, No. 1:22-cr-00015, ECF 1.  He also booked and paid for

two rooms at the Hilton Garden Inn in Washington, D.C., from January 5 through 7, 2021, using

two different credit cards.  Sixth Superseding Indictment at 21, *USA v. Caldwell*, No. 1:21-cr-

00028 (D.D.C. Dec. 1, 2021), ECF 513.

"Video recorded on January 6, 2021, captured [Meggs] among a 'stack' of more than a

dozen individuals dressed in camouflaged para-military gear moving in a deliberate and

organized manner toward the Capitol building."  Gov't Opp'n at 1, No. 1:21-cr-00028, ECF 98.

Additional video shows the same group "moments later embedded near the front of a violent

mob that is attempting to literally break open the doors of the Capitol building."  *Id.*

Photographs and surveillance video taken in the Capitol Rotunda also show Kelly and Connie

Meggs inside the Capitol building.  *Id.*; *id.* at 18 (photograph of Kelly and Connie Meggs).

Kelly Meggs stated in a chat message, "Ok who gives a damn who went in [to the Capitol

Building] . . . We are now the enemy of the State."  Gov't Opp'n at 2, No. 1:21-cr-00028, ECF

98.  Evidence revealed that Kelly Meggs "was searching for at least one member of Congress in

particular—House Speaker Nancy Pelosi."  Order Denying Mot. For Recons. at 3, *USA v.

Meggs*, No. 1:21-cr-00028 (D.D.C. Apr. 23, 2021), ECF 177.  In response to a message from

someone "hoping to see Nancy's head rolling down the front steps," Kelly Meggs stated he was

looking for Speaker Pelosi.  *Id.*

In his role as "team leader," Kelly Meggs used a variety of communication channels—

including calls and messages—to plan, coordinate, and execute the attack.  Indictment at 6, 14-

19, 20, 30, No. 1:22-cr-00015, ECF 1.  According to his Facebook messages, Kelly Meggs

contacted the Proud Boys[2] to coordinate Proud Boys and Oath Keepers actions on January 6th. Gov't Opp'n at 8, No. 1:21-cr-00028, ECF 98.  On and before January 6, 2021, Kelly Meggs contacted other Oath Keepers who were at the attack on the Capitol, including orally and in writing after entering restricted Capitol grounds.  Indictment at 24, No. 1:22-cr-00015, ECF 1.

Connie Meggs rode with her husband from Florida to Washington D.C., stopping at the home of the leader of the North Carolina chapter of the Oath Keepers.  Seventh Superseding Indictment at 18, No. 1:21-cr-00028, ECF 583.  She later "dropped off firearms, ammunition, and related gear" with the Oath Keepers' "Quick Reaction Force" at the Comfort Inn Ballston. *Id.* at 19.  On January 6th, she joined Kelly Meggs and other Oath Keepers at the Ellipse rally in a "stack" that entered the Capitol Building.  *Id.* at 19, 21-22.[3]

The attack on the Capitol ultimately "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  *Trump*, 20 F.4th at 15 (citation omitted).  Law enforcement eventually cleared the rioters, and the electoral count successfully resumed later that night in the Senate after a nearly six-hour delay.  After the attack, Kelly Meggs is alleged to have obstructed investigations into his actions related to the attack. Indictment at 41, No. 1:22-cr-00015, ECF 1.  He deleted information from his cell phone related to the causes, impact, and methods of the attack.

---

[2] The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists," and its leaders are alleged to have entered a conspiracy to "stop, delay, and hinder the Certification of the Electoral College vote."  Second Superseding Indictment at 3, 8, *USA v. Nordean*, No. 1:21-cr-00175 (D.D.C. Mar. 7, 2022), ECF 305.  Members of the Proud Boys were some of the first to break through police barricades, break windows, and enter the Capitol during the attack.  *See id.* at 18-22.

[3] A second "stack" of other Oath Keepers entered the Capitol Building later that afternoon. Indictment, No. 1:22-cr-00015, ECF 1 at 5 (Jan. 12, 2022).

**B.     The Formation of the Select Committee**

In response to this unprecedented attack, the House of Representatives adopted House

Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the

United States Capitol."  The resolution authorizes the Select Committee to: (1) "investigate the

facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol";

(2) "identify, review, and evaluate the causes of and the lessons learned from the domestic

terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such

findings, conclusions, and recommendations for corrective measures . . . as it may deem

necessary."  H. Res. 503, § 4(a)(1)-(3).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House

to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed

after consultation with the minority leader."  H. Res. 503, § 2(a).  Consistent with the Resolution,

the Speaker initially appointed seven Democrats and one Republican and then consulted with the

House Minority Leader, who recommended five additional Republicans.[4]  The Speaker then

spoke with the Minority Leader, advised that she would appoint three of those he had

recommended, and asked the Minority Leader to recommend two other Republicans.[5]  After the

Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the

---

[4] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on
Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack
on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release).
[5] *Id.*

Speaker named an additional Republican to the Select Committee.  *See* Compl. ¶¶ 69-70.[6]  Since then, the Select Committee has functioned with seven Democrats and two Republicans.

### C.    The Select Committee's Subpoena to Verizon

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6th, the Select Committee has issued subpoenas to various government agencies, private companies, and certain individuals.  The Select Committee served Verizon with a subpoena seeking subscriber information, connection records, and records of session times and durations of calls for the period of November 1, 2020 through January 31, 2021 for the Meggs's Verizon account (no contents of calls or geolocation data were sought).  *See* Compl. ¶ 5.

On January 3, 2022, Plaintiffs Kelly and Connie Meggs brought this case.  Plaintiffs ask this Court to declare that: the subpoena is "ultra vires, unlawful, and unenforceable"; the subpoena "serves no valid legislative purpose and exceed[s] the Select Committee's Constitutional authority"; "the Select Committee is acting for political purposes and not for legislative purposes"; the subpoena "violates Mrs. Meggs' First Amendment rights"; the subpoena "violates Mrs. Meggs' Fourth Amendment rights"; "compliance with the Verizon Subpoena violates the Plaintiffs' right under the Sixth Amendment";  "compliance with the Verizon Subpoena would violate the Marital Communications Privilege"; and "compliance with the Verizon Subpoena would violate Stored Communications Act."  Compl. Prayer for Relief ¶¶ a-h.

Plaintiffs also ask this Court to issue an injunction: "quashing the Verizon Subpoena and prohibiting [its] enforcement by Defendants"; "prohibiting Defendants from imposing sanctions

---

[6] *See also* Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021), https://perma.cc/4JNC-73R2.

for noncompliance with the Verizon Subpoena"; and "prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Verizon Subpoena." *Id.* ¶¶ i-k.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

Plaintiffs' various theories are all flawed.  *First*, the D.C. Circuit has already held that the Select Committee has a valid legislative purpose.  That purpose undoubtedly encompasses Plaintiffs' call data records on and around January 6th.  And as other federal courts have held, the Select Committee is validly constituted.  *Second*, the Stored Communications Act does not govern the legislative subpoena at issue here, which seeks non-content information.  *Third*, the marital privilege does not shield the information the subpoena seeks.  *Fourth*, all of Plaintiffs' constitutional claims fail.  This suit should therefore be dismissed.

## I.     The Select Committee Has a Valid Legislative Purpose and Is Validly Constituted

"[T]he January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had."  *Trump*, 20 F.4th at 41 (internal quotation marks and citation omitted).  In reaching this holding, the D.C. Circuit described

"Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations." *Id.* at 17.[7]

Although Plaintiffs' complaint was filed shortly after the D.C. Circuit decided *Trump v. Thompson*, Plaintiffs repeatedly insist that the Select Committee does not serve a legislative purpose, Compl. ¶¶ 15, 35, 80, 109, 120, 128, 138, and they improperly ask this Court to declare—contrary to the D.C. Circuit's holding—"that the Select Committee is acting for political purposes and not for legislative purposes."  Compl. Prayer for Relief ¶ c.

Plaintiffs also allege that "[t]he Select Committee does not have a right to criminally investigate private citizens."  Compl. ¶ 21; *see also id.* ¶ 11 (alleging "[t]he Select Committee exceeds its authority by searching for criminal activity when it is constitutionally prohibited from such activity through the separation of powers.").  But the Select Committee is not criminally investigating Plaintiffs or anyone else—nor is the Select Committee, by investigating the January 6th attack, trying to "expose [Plaintiffs' information] for the sake of exposure."  Compl. ¶ 23. Indeed, the D.C. Circuit rejected this very argument:

> Former President Trump argues that the Committee has an "improper law enforcement purpose[,]" Appellant Opening Br. 21, because its request constitutes an effort to "try" him "for . . . wrongdoing[,]" Appellant Opening Br. 21 (quoting *McGrain*, 273 U.S. at 179, 47 S.Ct. 319).  Not at all.  The Committee's announced purpose is to "issue a final report to the House containing such findings, conclusions, and recommendations' for such "changes in law, policy, procedures, rules, or regulations" as the Committee "may deem necessary[.]"  H.R. Res. 503 § 4(a)(3), (c). . . . The mere prospect that misconduct might be exposed does not make the Committee's request prosecutorial.  Missteps and misbehavior are common fodder for legislation.

*Trump*, 20 F.4th at 42.  That holding governs here.

---

[7] Other courts have also rejected similar allegations.  *See* Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-cv-3366 (D.D.C. Jan. 20, 2022), ECF 27.; Order Denying Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 8:22-cv-00099 (C.D. Cal., Jan. 25, 2022), ECF 43 (holding that "the issues surrounding the 2020 election and the January 6th attacks" are "clearly 'subjects on which legislation could be had'").

To the extent Plaintiffs suggest that the Select Committee was not validly formed or authorized, Compl. ¶¶ 71-73, the Rulemaking Clause of the Constitution bars federal courts from considering claims about the Select Committee's internal operations.  *See* U.S. Const., Art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings.").  That provision is a critical aspect of the Legislative Branch's constitutional design because it "grants the House the power to make its own Rules about its internal proceedings," *Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013), which "only empower[] Congress to bind itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983).  Both courts that have considered challenges to the Select Committee on these grounds have rejected them.  *See* Jan. 20, 2022 Oral Arg. Tr. 34:1-5, 8-10, *Budowich*, ECF 27 (holding that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping Congressional authority" to hold that the Select Committee was not validly composed); Order at 9 & n.12, *Eastman*, ECF 43.  As the D.C. Circuit has explained, entertaining challenges to committee assignments is a "startlingly unattractive idea, given [courts'] respect for a coequal branch of government, for [a federal court] to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1175-77 (D.C. Cir. 1982) (internal quotation marks omitted).

Regardless, Plaintiffs' challenges to the Select Committee's composition are deeply flawed.  The House utilizes four distinct kinds of Committees, each of which is established and governed by various House Rules, statutes, House resolutions, or on an *ad hoc* basis.  *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (rules governing standing Committees); 26 U.S.C. §§ 8001-8005 (establishing the Joint Committee on Taxation); H. Res. 503 (establishing the Select Committee); *accord Cellco P'ship v. FCC*, 357 F.3d 88, 96 (D.C. Cir. 2004) (taking judicial notice of an agency report); *LeBoeuf, Lamb, Greene & MacRae,*

10

*LLP v. Abraham*, 347 F.3d 315, 325 (D.C. Cir. 2003) (same, letter to Congress).  Applicable to the Select Committee, House Rules state that "[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."  House Rule I.11.

By unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).  In addition to the deference the D.C. Circuit has held must be accorded Congress in determining its own rules, such decisions are entitled to the "presumption of regularity," which the Select Committee and Members of Congress, like all government officials, enjoy.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (internal quotation marks omitted).  None of the allegations in the Complaint comes close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926), required to overcome that presumption.

*First*, Plaintiffs note that the Speaker has appointed only nine Members to the Select Committee, rather than the thirteen the Resolution allows.  Compl. ¶ 71; H. Res. 503 § 2(a) ("The Speaker shall appoint 13 Members . . .").  But the Resolution does not require that *all* thirteen Members be appointed at once for the Select Committee to function, nor does the authorization to appoint thirteen Members require appointment of that precise number.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (recognizing that "shall" sometimes means "may").  Prior House select committees have operated with fewer than their full allotment of Members.  For example, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using similar language to the Resolution here.  *See* H. Res. 437, § 2(a), 109th Cong. (2005) ("The select committee shall be composed of 20 members appointed by the

Speaker . . .").  Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the Republican majority party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members appointed by Speaker Hastert).

In fact, House Resolution 503 contemplates the possibility of "vacancies" but provides no specific timeline for filling them.  H. Res. 503, § 2(c).  Nor does the Resolution provide that the Select Committee becomes invalid or that it must suspend all action when vacancies arise.  *Id.*  Moreover, the fact that the full House affirmatively ratified actions of the Select Committee confirms that the Select Committee is duly constituted.  *See* H. Res. 851, 117th Cong. (2021) (approving Select Committee's referral for contempt of Congress); H. Res. 730, 117th Cong. (2021) (same).

*Second*, Plaintiffs complain that the Republican Members of the Select Committee were not recommended by the Minority Leader.  Compl. ¶¶ 69-70.  But the power to appoint Members to select committees rests exclusively with the Speaker of the House.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "[i]nstances in which the majority declined to recognize minority recommendations for committee assignments.").

House Resolution 503 is not to the contrary.  When creating the Select Committee, the House only required that Members be chosen "after *consultation* with the Minority Leader," H. Res. 503, § 2(a) (emphasis added), which allows the Speaker greater authority regarding the appointment of minority party Members.  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or

information of.'") (internal quotation marks omitted); Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past. *See* H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) (Select Committee on the Climate Crisis required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (Select Committee on the Modernization of Congress). Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so. *See*, *e.g.*, H. Res. 24, § 2(a), 110th Cong. (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted. Compl. ¶ 69. The fact that the Speaker—using the authority provided to her by the House Rules, the January 4, 2021 Order of the House, and House Resolution 503—made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

Moreover, since its creation, the Select Committee has operated with seven Democrats and two Republicans, and the full House has ratified that means of operation repeatedly, including through votes approving two resolutions of contempt.[8] There is thus no basis for a court to substitute its interpretation of the terms "shall" and "consultation" for the House's view;

---

[8] Recommending that the House of Representatives find Mark Randall Meadows in contempt of Congress for refusal to comply with a subpoena duly issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol, H. Res. 851, (117th Cong. 1st Sess.); Recommending that the House of Representatives find Stephen K. Bannon in contempt of Congress for refusal to comply with a subpoena duly issued by the Select Committee to Investigate the January 6th Attack on the United States Capitol, H. Res. 730, (117th Cong. 1st Sess.).

indeed, making such a determination would be impermissible and "tantamount to 'making the [House] Rules.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (2019) (emphasis omitted); *see also* Order at 9 & n.12, *Eastman*, ECF 43; *Vander Jagt*, 699 F.2d at 1175.

## II.   The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from Verizon Pursuant to a Lawful Subpoena

The Complaint asserts that the Select Committee's subpoena to Verizon violates the Stored Communications Act, 18 U.S.C. § 2701 *et seq*.  *See* Compl. ¶¶ 126-36.  That claim is wrong as a matter of law.  Nothing in the Act limits the ability of a Congressional committee to obtain non-content information from a "person or entity providing electronic communication service to the public" via a lawful, duly authorized subpoena.  18 U.S.C. § 2702(a)(1).[9]

As a preliminary matter, contrary to Plaintiffs' inaccurate suggestion that the subpoena seeks the production "of the contents of communication," Compl. ¶¶ 89, 94, the subpoena does not in fact seek the contents of any communication.  Instead, it merely seeks "subscriber information" and "connection records and records of session times and durations."  Compl. ¶ 5. Subscriber information is limited to information about the user of the account, associated phone numbers, and other identifying numbers.  "Connection records" and "records of session times and durations" simply mean records of the date and time, duration, and sender and recipient of any call, text message, or other communication.[10]  The subpoena thus does not seek the contents of any communication.

---

[9] The Select Committee agrees with Plaintiff that Verizon is such a "person or entity" under the statute.

[10] Connection Records and Records of Session Times and Durations are defined in the subpoena as, "All call, message (SMS & MMS), Internet Protocol ('IP'), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections." *Id.*

Although the very applicability of the Stored Communications Act to Congressional subpoenas could be questioned,[11] the Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena.  The Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  18 U.S.C. § 2702(a), (c).  The definition of the term "governmental entity" as used in the Act does not include Congress.

Further the Act expressly *permits* disclosure to "any person other than a governmental entity."  *Id.* § 2702(c)(6).  And the statute's definitional terms make clear that Congress did not intend for the phrase "governmental entity" to include Congress.  *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning.") (internal quotation marks and citation omitted).  The Stored Communications Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof."  18 U.S.C. § 2711(4).  The terms "department" and "agency" have particular meanings in Title 18, as defined in 18 U.S.C. § 6.  That provision defines "department" as "one of the *executive* departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."  18 U.S.C. § 6 (emphasis added).  It likewise defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any

---

[11] The Stored Communications Act contains two main, operative sections.  The first, 18 U.S.C. § 2702, addresses "[v]oluntary disclosure" of information.  The second, 18 U.S.C § 2703, addresses "[r]equired disclosure" of information.  The first arguably does not apply to Congressional subpoenas because disclosure under such subpoenas is not "voluntary."  The second cannot apply to Congressional subpoenas because § 2703 only applies to the subpoenas of "governmental entit[ies]" and, as noted above, Congress does not fall within the statutory definition of a "governmental entity."

corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense." *Id.* The Select Committee is neither an executive department nor a governmental agency, and the Stored Communications Act contains no indication that these terms have a different meaning there as opposed to everywhere else in Title 18.

The Supreme Court addressed a similar claim in *Hubbard v. United States*, 514 U.S. 695 (1995), a case concerning 18 U.S.C. § 1001, which forbids making false statements to "any department or agency of the United States," and whether that provision applied to the Judicial Branch. *Id.* at 698-99. The Court noted initially that the definitions in Section 6 presumptively applied to "all of Title 18," including Section 1001. *Id.* at 700. The Court stated it was "incontrovertible" that "agency" did not refer to any court within the Judicial Branch. *Id.* The Court further held that nothing in the context of Section 1001 "shows" that the term "department" was intended to apply beyond the Executive Branch. *Id.* (quoting 18 U.S.C. § 6). The Court stated that there is "nothing in the text of the statute, or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." *Id.* at 701. The Act's definition of "governmental entity" and the definition contained in Section 6 make plain that it does not apply to Congress, and there is nothing in the Act that even suggests, let alone "shows," that Congress intended to include itself in the definition.

Moreover, the statute contains other provisions that further reinforce this plain meaning. For example, Section 2712 provides that, in the case of willful or intentional violations of the Act, the "head of the department or agency" in which the violation occurred may subject the violator to administrative discipline. 18 U.S.C. § 2712(c). Neither Congressional leadership nor its House or Senate committees are the "head" of an agency or department. As the Supreme

16

Court has long held, "[t]he term 'head of a Department' means . . . the Secretary in charge of a great division of the *executive branch* of the government, like the State, Treasury, and War, who is a member of the Cabinet."  *Burnap v. United States*, 252 U.S. 512, 515 (1920) (emphasis added); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 642 (2d Cir. 2019), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) (use of term "head of the agency or department" indicated Congress did not intend Right to Financial Privacy Act to apply to Congressional committee).

Furthermore, the Act's provisions related to required disclosure of records contemplate that the governmental entity may obtain such records by certifying to a court that the records sought are "relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), which Congress does not have the authority to undertake.  *See Watkins v. United States*, 354 U.S. 178, 187 (1957) (Congress may not undertake investigation as "a law enforcement . . . agency" or "to 'punish' those investigated").

Accordingly, the plain text of the Stored Communications Act, as well as the overall context and structure of the statute, foreclose Plaintiffs' argument that the subpoena violates the Act.

## III.    Plaintiffs' Marital Privilege Claim Fails

Plaintiffs also argue that the subpoena violates the marital communications privilege. Compl. ¶ 15.  They claim that "[p]rivate communications between Mrs. Meggs and her husband Kelly Meggs are subject to the marital communications privilege recognized in court proceedings."  *Id.* ¶ 117.  Any marital privilege, however, does not apply to the material requested by the subpoena.

As the Supreme Court has explained, marital "privilege, generally, extends only to utterances, and not to acts."  *Pereira v. United States*, 347 U.S. 1, 6 (1954) (citation omitted).  "It

is well established that this privilege applies only to utterances or expressions intended by one spouse to convey a message to the other." *United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir. 1977) (wife's testimony relating to knowledge about and observation of husband's pants did not involve any communication and thus not protected by marital privilege); *United States v. Lewis*, 433 F.2d 1146, 1151 (D.C. Cir. 1970) ("It has not been the rule in the federal courts that acts become confidential communications merely because during coverture they are performed by one spouse in the presence of the other."); *United States v. Marashi*, 913 F.2d 724, 729 (9th Cir. 1990) (marital "privilege extends only to words or acts intended as communication to the other spouse"). Because the subpoena seeks only data, not the content of any utterances, any marital privilege does not apply to the subpoena here.

Moreover, to the extent Kelly and Connie Meggs included third parties in their communications, even the content of their utterances would not be protected by marital privilege. It appears that the Meggs's adult son, Zach Meggs, may have been included in at least some of Kelly and Connie's communications. *See* Mot. to Hold in Abeyance, *United States v. Caldwell, et al.*, No. 1:21-cr-00028 (D.D.C. Sept. 30, 2021), ECF 444 (noting that "[t]he government has advised that these communications included a third-party, the Meggs's adult son, Zach Meggs"). "Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private. . . . The presence of a third party negatives the presumption of privacy." *Pereira*, 347 U.S. at 6 (internal citations omitted); *see also Marashi*, 913 F.2d at 730.

Likewise, "the marital communications privilege does not apply to statements made in furtherance of joint criminal activity." *Marashi*, 913 F.2d at 731. As the indictment in Plaintiffs' criminal case lays out in detail, the data at issue here may have furthered joint criminal

activity.  *See* Sixth Superseding Indictment, *United States v. Caldwell, et al.*, No. 1:21-cr-00028 (D.D.C. Dec. 1, 2021), ECF 513.  Plaintiffs' marital privilege claim, therefore, fails.

## IV.     Plaintiffs Fail to State a Proper Constitutional Challenge to the Subpoena

Plaintiffs invoke three separate constitutional provisions that they allege would be violated should Verizon comply with the subpoena: their First, Fourth, and Sixth Amendment rights.  Compl. ¶ 15.  None of these provisions is implicated here.

### A.     The Subpoena Does Not Violate Plaintiffs' First Amendment Rights

Plaintiffs allege that the subpoena violates Plaintiffs' "Right of the Freedom of Association under the FIRST AMENDMENT."  Compl. ¶ 145; *see also id.* ¶¶ 118, 123-25. Plaintiffs further argue that the subpoena violates their First Amendment rights because "[b]y investigating the causes of the 'terrorist attack,' [on January 6] Congress by definition would be investigating 'political beliefs' as January 6th took place both at the Capitol" and "[b]ecause Congress has no power to end free speech or repeal the First Amendment, it has no power to investigate political beliefs or the exercise of free speech."  Compl. ¶ 31.

The subpoena at issue here does not implicate Plaintiffs' "political beliefs" nor seek the content of any communications.  The subpoena instead seeks subscriber information, connection records, and records of session times and durations of calls and messages.  Compl. ¶ 5.  None of this data reveals Plaintiffs' political beliefs or any other specific content.

Any argument that the subpoena implicates Plaintiffs' First Amendment rights is foreclosed by *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 509 (1975).  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional

subpoena is involved.  *Id*. at 509 & n.16.  Plaintiffs' First Amendment arguments against enforcement of the Select Committee's subpoena accordingly must be dismissed.

Even if Plaintiffs' claim were subject to a balancing test, it would still fail: the balancing of "the competing private and public interests at stake" here plainly favors the Select Committee. *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  This Court has rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring "the free functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (citation omitted).

The Select Committee is doing precisely that by seeking cell phone data for the three-month period surrounding January 6, 2021.  Plaintiffs, by contrast, fail to assert any First Amendment interest that could outweigh the very grave public interest here.  Their conclusory assertions that "[t]he Verizon subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries," Compl. ¶ 123, and "work a massive chilling of current and future activists' associational and free speech rights," *id.* ¶ 124, are too amorphous to be actionable.  Courts require far more specificity than Plaintiffs allege.[12]

---

[12] *See Buckley*, 424 U.S. at 74 (stating that showing an associational injury requires demonstrating "a reasonable probability that the compelled disclosure" "will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears. . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights.").

Even if Plaintiffs were able to substantiate a legitimate interest implicated by the subpoena, it is far outweighed by the Select Committee's interest. The Select Committee's subpoena seeks records relevant to determining the root causes of the January 6th insurrection that resulted in multiple deaths and aimed to prevent Congress from carrying out its constitutional responsibility to officially count the state electoral votes. This is a paradigmatic example of the governmental interest in the "free functioning of our national institutions." *Buckley*, 424 U.S. at 66 (citation omitted). Accordingly, the Complaint fails to state a First Amendment claim on which relief may be granted.

### B.       The Subpoena Does Not Violate Plaintiffs' Fourth Amendment Rights

Plaintiffs allege that the subpoena violates Plaintiffs' "right of privacy under the FOURTH AMENDMENT." Compl. ¶ 145; *see also id.* ¶¶ 99-114. The D.C. Circuit recently held in *Trump v. Thompson*, 20 F.4th at 24, that "Congress's power to obtain information is broad and indispensable . . . and encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." (internal punctuation omitted). In light of this holding, Plaintiffs' argument that the subpoena violates the Fourth Amendment because it "is so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee," Compl. ¶ 112, is wrong. A subpoena is not impermissibly overbroad if its call for documents or testimony is within the scope of the Congressional inquiry at issue. *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).

The Select Committee's inquiry includes examining the January 6th attack as well as its "circumstances" and "causes," to inform a consideration of "changes in law, policy, procedures, rules, or regulations." H. Res. 503 § (3)(1), 4(c). Given that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate and is not impermissibly broad.

*See Eastland*, 421 U.S. at 509.  Specifically, there is reason to believe Plaintiffs were involved in planning parts of the militia operations in the attack on the Capitol, and that they participated in carrying out those plans.  *See* pp. 3-5 *supra*.  Given that an express purpose of the Select Committee is to "investigate and report upon the facts, circumstances, and causes . . . relating to the interference with the peaceful transfer of power . . . as well as the influencing factors that fomented such an attack," records relating to the plans regarding the attack on the Capitol and to leaders' use of certain communication channels are clearly within the ambit of its inquiry.  *See McPhaul*, 364 U.S. at 382.  Thus, the subpoena is not overbroad and does not violate Plaintiffs' Fourth Amendment rights.

## C.     The Subpoena Does Not Violate Plaintiffs' Sixth Amendment Rights

Plaintiffs allege that the subpoena violates their "Right to a Fair Trial under the SIXTH AMENDMENT to include a jury with a cross section of the population."  Compl. ¶ 145; *see also id.* ¶ 119 ("in seeking to subpoena Mrs. Meggs' phone records, the Committee is directly interfering with the Judicial Branch, which violates the Separations of Powers, wherein Mr. and Mrs. Connie Meggs have a Sixth Amendment Right to a Fair Trial, and they are both currently scheduled for a criminal trial on felony criminal charges").  Plaintiffs contend that "[a] release of these records, with a pending criminal trial, would be unduly and highly Prejudicial to getting a fair jury cut from a cross-section of the District of Columbia."  Compl. ¶ 16; *see also id.* ¶ 147.  These allegations fail for multiple reasons.

*First*, the subpoena asks that the records be released to the Select Committee, not disclosed publicly.  *See Exxon Corp. v. F.T.C.*, 589 F.2d 582, 586 (D.C. Cir. 1978) ("disclosure to Congress d[oes] not constitute 'public disclosure'").  Any release of the information to the Select Committee would not implicate the broader D.C. jury pool.  And, even if the requested records were made public, there is no reason to think that subscriber information,

connection records, and records of session times and durations of calls and messages for the period of November 1, 2020, through January 31, 2021, *see* Compl. ¶ 5, could taint a jury pool.

*Second*, "[t]he protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions." *Austin v. United States*, 509 U.S. 602, 608 (1993) (internal quotation marks and citation omitted). Because this is a civil case, Plaintiffs' Sixth Amendment claim immediately fails. Certainly, Plaintiffs are free to raise any Sixth Amendment argument in their criminal trial, but Plaintiffs cite no authority to support their presumption that the Sixth Amendment can give rise to an independent civil claim. Likewise, the Sixth Amendment does not provide a ground to invalidate a legislative subpoena. Plaintiffs cite no authority—and the Select Committee is aware of none—supporting the suggestion that criminal defendants are insulated from Congressional subpoenas simply because they face criminal charges. Indeed, such a principle rewarding those charged with criminal offenses would make little sense.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint in its entirety.

Respectfully submitted,

/s/  Douglas N. Letter
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

John A. Freedman[*]
Paul Fishman[*]
Amy Jeffress[*]
David J. Weiner[*]
John M. Hindley[*]
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher[*]
Michael Tremonte[*]
Noam Biale[*]
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com

24

MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

Dated: March 28, 2022

\* Appearing pursuant to 2 U.S.C. § 5571(a).

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*___
Douglas N. Letter