**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Civil Division

**CONNIE MEGGS, Et al.**

      Plaintiffs

v.

**SELECT COMMITTEE TO
INVESTIGATE THE JANUARY 6ᵀᴴ
ATTACK ON THE UNITED STATES
CAPITOL, 1540A Longworth House Office
Building, Washington, DC 20515, Et al.**

      Defendants.

**Civil Action No.  1:22-cv-00005**

**PLAINTIFFS' OPPOSITION MEMORANDUM
OF POINTS AND AUTHORITIES TO DEFENDANTS' MOTION TO DISMISS**

COMES NOW Connie Meggs (Mrs. Meggs) and her husband, Kelly Meggs, jointly file this Opposition Memorandum of Points and Authorities, by and through undersigned counsel, to the Defendants, the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamie B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, and the Select Committee to Investigate the January 6th Attack on the United States Capitol Defendants,  [hereinafter the "Committee Defendants" or the "Select Committee"] Motion to Dismiss.  Plaintiffs' respectfully request Oral Argument on this motion.

# TABLE OF CONTENTS

I.      BACKGROUND…………………..p.2

II.     STATEMENT OF FACTS………..p.7

III.    INTRODUCTION ………………..p.10

IV.    LEGAL ARGUMENT …………..p.12

       a.   LACK OF A LEGISLATIVE PURPOSE AND NEXUS ……………..p.13

       b.   THE FORMATION OF THE COMMITTEE IN VIOLATION OF ITS
            OWN RESOLUTION ……………………………………………   p.19
       c.   THE SIXTH AMENDMENT RIGHT OF THE CRIMINAL
            DEFENDANT PLAINTIFFS…………………………………   p.25
       d.   THE FIRST AMENDMENT………………………………….p. 28
       e.   THE MARITAL COMMUNICATIONS PRIVILEGE……………..p..30

       f.   THE FOURTH AMENDMENT………………………………….p.32

       g.   THE SUBPOENA VIOLATES FEDERAL STATUTORY LAW….p. 34

V.     CONCLUSION………………………………………………………..p.35

# TABLE OF AUTHORITIES

*Bowers v. United States*, 202 F.2d 447, 448, (D.C. Cir. 1953)……………………………p.14, 18

*Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018)(*citing Smith v. Maryland*, 442 U.S. 735, 740 (1979))……………………………………………………………………………………p.33

*Deutch v. United States*, 367 U.S. 456, 471, 81 S. Ct. 1587, 1595, 6 L. Ed. 2d 963, 973, (1961)……………………………………………………………………………………p.13, 14

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 506, 95 S. Ct. 1813, 1823, 44 L. Ed. 2d 324, 338, (1975)……………………………………………………………………..p.14

*Good News Club v Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)………………………………………………………………………………………p.5

*Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019),……………p. 13

*Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993)…………...p.5

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129, 127 S. Ct. 764, 772, 166 L. Ed. 2d 604, 616, (2007). ………………………………………………………………………p.13

*N.A.A.C.P. v. Alabama*, 357 U.S. 449 (1958)……………………………………………p.29

*Rangel v. Boehner*, 20 F. Supp. 3d 148, 169, 1 (D.C. Cir. 2013 )…………………………p.20-21

*Trump v. Mazars USA*, LLP, 140 S. Ct. 2019, 2031-2032, 207 L. Ed. 2d 951, 964-965, (2020)……………………………………………………………………p.14, p.15, p.26

*Trump v. Thompson,* 2021 U.S. App. LEXIS 36315, (cited by Defendants, Trump v. Thompson, 20 F. 4th 10, 41), *p*……………………………………………………………p.17, 19-20, 22

*United States v. Morrison,* 529 U.S. 598, 612-613, 120 S. Ct. 1740, 1751, 146 L. Ed. 2d 658, 672-673 (2000) ………………………………………………………………… ……..…...p.15, p.16
*SEC v. Lavin,* 111 F.3d 921, 925, (D.C. Cir. 1997)……………………………………………..p. 30

*Senate Permanent Subcom. on Investigations v. Ferrer*, 856 F.3d 1080, 1087, 429 U.S. App. D.C. 78, 85, (D.C. Cir. 2017)……………………………………………………………p.29

*Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), aff'd, 856 F.3d 1080 (D.C. 2017) …………………………………………………………………..p. 29

*Smith v. Maryland*, 442 U.S. 735, 740 (1979) …………………………………………..p. 33.

*Taylor v. Louisiana*, 419 U.S. 522, 530-531, 95 S. Ct. 692, 698, 42 L. Ed. 2d 690, 698, (1975)……………………………………………………………………………...p.25, 26.

*United States v. Brock*, 724 F.3d 817, 820, (7th Cir. 2013)……………………………p.30, 31

*United States v. Miller*, 425 U.S. 435 (1976) …………………………………….........p.33

*United States v. Marashi*, 913 F.2d 724, 731 (9th Cir. 1990)……………………………………p.31

*United States v. Pineda-Mateo*, 905 F.3d 13, 22-23, (1st Cir. 2018)…………………………p.32

*U.S. v. Crowl*, 1:21-cr-00028-APM,  ECF 583, Seventh Indictment, …………………………p.2

*U.S. v. Rhodes*, Case 1:22-cr-00015-APM, ECF-1, Indictment………………………………...p.2

*Vander Jagt v. O'Neill*, 699 F.2d 1166, 1172, (D.C. Cir. 1982)…………………………...p. 22.

*Yellin v. United States*, 374 U.S. 109, 111, 83 S. Ct. 1828, 1830, 10 L. Ed. 2d 778, 782, (1963)……………………………………………………………………………………………p.20

Amendments I, IV and VI…………………………………………………………... pp. 25-32.


Brief of Respondents Bennie G. Thompson and the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol in opposition filed Before the United States Supreme Court, at p. 12-13 *citing* to the District court and the Court of Appeals for the D.C. Circuit. …………………………………………………………………………………p. 20


*See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).  ……………………………………………………p.23, p.24, p.26.

## **Statutes and Rules**

18 U.S.C. § 1512(c)(2) and 2, or § 1512(k) …………………………………………………p.6

18 U.S.C. §§ 2701 *et seq*………………………………………………………………………p.34

18 U.S.C. §§ 2702(c)(1), 2703(c) ……………………………………………………………..p. 34

18 U.S.C. § 2702(a)(3)…………………………………………………………………………p.34

18 U.S.C. § 2711(4) …………………………………………………………………………....p. 34

D.C. Code § 22-3152……………………………………………………………………………26-27

D.C. Code § 14-306…………………………………………………………………………….p. 32


FRCP Rule 12(b)(3)(A)(iv) …………………………………………………………………...p.10

H. Res. 503 (June 28, 2021)(117th Congress, First Session.) ………..p.11, 14, 16, 17, 22, 23, 24.

Exhibit A:  Subpoena ………………………………………………………..p.11, p.12, p.13

## I.      **BACKGROUND**

By way of background, Connie and Kelly Meggs, are charged criminally in relation to their alleged presence and entry into the Capitol on January 6, 2021.  *See Generally Seventh Indictment*, 21cr00028; and *U.S. v. Rhodes*, 21cr00015.  It is important to raise what the Indictment does not plead to counter the prejudice of repeated allegations that are yet unproven. The Defendants' Motion to Dismiss recounts unproven criminal allegations that highlight the fundamental right that each individual defendant get a fair trial before a fair cross-section of the population with limited prejudice of partisan allegations that remain unproven.  (*ECF 34-1, Defs.' Motion at p. 3-5*).

A fact in relation to January 6, 2021 that gets lost is that a 100% perfectly-peaceful rally was held that day, near an area of the Washington Mall and South Lawn of the White House between the Washington Monument and the Ellipse area of the White House grounds by the Incumbent President, Candidate for President, had had a rally.  A fundamental First Amendment right – that gets lost because of the later chaos, and in the Select Committee's Statements and actions about terrorism.  Anticipated by Mayor Bowser[1],  First Amendment activities were planned for the week of January 6th –

---

[1] The Mayor's Correspondence of January 5th, 2021 to the DOJ and DOD and the Army.



**MURIEL BOWSER**
MAYOR

January 5, 2021

The Honorable Jeffery Rosen
Acting United States Attorney General
950 Pennsylvania Ave, NW
Washington, DC 20530

The Honorable Ryan D. McCarthy
Secretary of the Army
101 Army Pentagon
Washington, DC 20310

The Honorable Chris Miller
Acting Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301

Dear Acting Attorney General Rosen, Secretary McCarthy, and Acting Secretary Miller:

As the law enforcement agency charged with protecting residents and visitors throughout the District of Columbia, the Metropolitan Police Department (MPD) is prepared for this week's First Amendment activities. MPD has coordinated with its federal partners, namely the US Park Police, US Capitol Police and the US Secret Service—all of whom regularly have uniformed personnel protecting federal assets in the District of Columbia. This week, MPD has additional logistical support of unarmed members of the DC National Guard, who will work under the direction of, and in coordination with, MPD.

The District of Columbia Government has not requested personnel from any other federal law enforcement agencies. To avoid confusion, we ask that any request for additional assistance be coordinated using the same process and procedures.

We are mindful that in 2020, MPD was expected to perform the demanding tasks of policing large crowds while working around unidentifiable personnel deployed in the District of Columbia without proper coordination. Unidentifiable personnel—in many cases, armed—caused confusion among residents and visitors and could become a national security threat with no way for MPD and federal law enforcement to decipher armed groups.

To be clear, the District of Columbia is not requesting other federal law enforcement personnel and discourages any additional deployment without immediate notification to, and consultation with, MPD if such plans are underway. The protection of persons and property is our utmost concern and responsibility. MPD is well trained and prepared to lead the law enforcement, coordination and response to allow for the peaceful demonstration of First Amendment rights in the District of Columbia.

Sincerely,

Muriel Bowser
Mayor

Cc: Congresswoman Eleanor Holmes Norton

3

While recognizing the application of the First Amendment to the January 6th planned activities, the Mayor's Correspondence also shows the Mayor's demand that the other agencies stand down on January 6th.   The application of the First Amendment and the need for particularity can be juxtaposed against the history in front of Congress and protestors[2]:

> [3]…But in Washington, the Capitol complex and committee hearings are by law and democratic tradition open to the public unless secret intelligence matters are being discussed.  The police who guard the Capitol complex will not ban serial disrupters from the premises unless a judge deems extraordinary circumstances warrant it.

> "The US Capitol Police respects and protects the right of people to peaceably assemble and exercise their rights under the First Amendment" to the US constitution, spokeswoman Lt Kimberly Schneider said in a statement.  "We balance providing security with maintaining a safe and open campus that is accessible to the general public."[4]

Of course the time, place, and manner of exercising free speech may be regulated, and of course the violence committed by a very few is never acceptable.  The U.S. Capitol is "secured" -- but not closed -- 24 hours a day.  However, the Capitol complex is designed and

---

[2] In 2012, birthday-suit-clad protesters rushed House Speaker John Boehner's office when Seven naked protesters swarmed the office of Speaker John Boehner (R-OH) on Tuesday for some 20 minutes of loud chanting against cuts to AIDS funding.  ***After police showed up and repeatedly threatened to arrest the protesters for indecent exposure, they eventually put on their clothes and walked out of the Speaker's office.***  The three female protesters stuck around in the hallway to speak to reporters and were arrested anyway; the four male protesters appeared to get away, the organizers said.

*Nude Protesters Arrested After Storming Speaker Boehner's Office, By Sahil Kapur, Talking Points Memo, TPM, November 27, 2012*, https://talkingpointsmemo.com/dc/nude-protesters-arrested-after-storming-speaker-boehner-s-office

3 *Why Protesters Code Pink Stay Out Of Jail*, By Daniel Nasaw, BBC News Magazine, 19 September 2014, https://www.bbc.com/news/magazine-29280937

[4] *See Id. (emphasis added).*

intended for visitation by the public, with public viewing galleries built into each Chamber, with

no separation between the public and their elected representatives.  *See*, *Good News Club v*

*Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Lamb's Chapel*

*v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993) (limited public forums).

On January 7, 2021 the Washington Post, where Washingtonians go most often for their

daily dose of information, wrote in part:

> …Later at the U.S. Capitol, throngs of people pushed past police who were
> trying to block them from entering the building as lawmakers inside debated
> counting electoral college votes confirming Biden's victory. A mob was able to
> breach security and successfully enter the building, where one person was shot and
> later died.[5]

And in stark contrast that shows the political discrimination, on June 1, 2020, the

Washington Post reported that:

> And in those first moments on Sunday, [May 31, 2020] the more than 1,000
> people who marched to Lafayette Square across from the White House
> listened.  …Then came darkness, and with it, another night of mayhem. In
> the park, protesters faced the familiar pop, pop, pop of pepper bullets and
> stinging clouds of tear gas meant to push back hundreds of them as they
> tried, again and again, to break through the police barricades set up around
> President Trump's home.[6]

The protestors from the White House in 2020 were considered protected by the same

Members on the Select Committee as when they addressed protestors from Portland, for

example.

---

[5] https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html

[6] *Night of destruction across D.C. after protesters clash with police outside White House*, By Rebecca Tan, Marissa J. Lang, Antonio Olivo, Rachel Chason and John Woodrow Cox, Washington Post, June 1, 2020,

It was reported 'that that the protest [in Portland] is a continuation of a daytime march that occurred this afternoon."7 …"*Footage showed the rioters attempting to force their way into the courthouse while chanting "f\*\*\* the United States*!"8 ' Later in the evening rioters set a fire outside the courthouse entrance.'9  The state and federal Court Houses in Portland closed for weeks under attack and burned. 10  Congress returned at 8:00 PM on January 6, 2021.

The Comparison is also relevant to show that the charges of Assault on Federal Officers related to the Portland protests were dismissed.   And all were dismissed or marked n*olle prosequi*, with one action pending, (and who was dismissed because he died before they could dismiss); and for the few that remained, the government agreed to recommend probation.   Not one of these 74 federally charged defendants in Portland have been sentenced with having to go to prison or were charged under 18 U.S.C. § 1512(c)(2) and 2, or § 1512(k), much less seditious conspiracy.

Mr. Bennie Thompson in the summer of 2020 made clear his position against the President at the time, and in support of the Portland protestors, who he is quoted as saying were "*peaceful protestors with constitutional rights*."11  This in and of itself shows a stark difference

---

7 *See Rioters Set Fire to Federal Courthouse in Portland One Day after Fencing Removed (yahoo.com)*Zachary Evans*, Rioters Set Fire to Federal Courthouse in Portland One Day after Fencing Removed* https://news.yahoo.com/rioters-set-fire-federal-courthouse-162333860.html

8 These protesters were not charged with attempting to enter the property, or with Seditious conspiracy or the like.

9 *See* https://www.portlandoregon.gov/police/news/read.cfm?id=250952&ec=1&ch=twitter

10 *See* Portland Police Chief Slams Violence At Riots | National Review, August 6, 2020 Zackary Evans, https://www.nationalreview.com/news/portland-police-chief-slams-incomprehensible-violence-says-rioters-target-local-officers-with-mortars-and-commercial-grade-fireworks/

11 See July 20, 2020 letter from Chairman Bennie Thompson, signed by many Democrat Members.  Microsoft Word - 2020-07-20 T Wolf re Portland Protests.docx (house.gov)

and is political rhetoric where the language used on the Trump Supporters on January 6th,

according to Mr. Thompson, are all part of a *violent* attack and are *insurrectionists*.  It is one

thing for a Congressional representative to use political rhetoric, but it is quite another where a

prosecutor charges individuals based on an arbitrary difference.   The benefits of a fair trial

matter, are a constitutional right.  To show the distinctions of an unnoticed case included a

headline that appeared in the Washington Post: *A man planted [3] bombs hours after a Black*

*Lives Matter protest in Pittsburgh. He was sentenced to probation*.[12]  The story begins, "No one

could see the homemade bombs Matthew Michanowicz was carrying as he rode his bike in

downtown Pittsburgh on May 31, 2020."

## II.   <u>STATEMENT OF FACTS</u>

Prosecution did not allege actually allege either to have committed any act of violence;

however, this is clouded through allegations of guilt by association and actions by persons

unknown.   Neither is alleged to have brought any weapons to the District of Columbia, or to the

Capitol.[13]   Further, it is undisputed, that Kelly Meggs and the Oath Keepers did not have

offensive arms at the Capitol, including  firearms[14], arson tools, bombs, or even bricks.[15]  In the

---

[12] Edwards, Washington Post, December 07, 2021
https://www.washingtonpost.com/nation/2021/12/07/black-lives-matter-protest-bombs-pittsburgh/

[13] (See Seventh Indictment, 21cr00028; and U.S. v. Rhodes, 21cr00015.)

[14]   Jill Sanborn testified in Congress that the FBI did not confiscate any firearms from the Capitol and that no one got charged for firearms violations.  Sen. Ron Johnson (R-WI) questions witnesses during a Senate Homeland Security and Governmental Affairs & Senate Rules and Administration joint hearing to discuss the January 6th attack on the U.S. Capitol on March 3, 2021 in Washington, DC.  The Hill, https://youtu.be/AlxsZ-kQ5Ks;

[15] "*Fact check: Construction bricks in Washington D.C. removed on Jan. 6*," by Reuters Staff, https://www.reuters.com/article/uk-factcheck-construction-bricks-dc-remo/fact-check-construction-bricks-in-washington-d-c-removed-on-jan-6-idUSKBN29B2KM

case at bar, as similarly situated defendants, it is undisputed, or the court can take judicial notice

that Congress was in recess at 2:40 P.M., when the Plaintiffs, Connie Meggs and Kelly Meggs

are alleged to have entered the Capitol.  (ECF 583, 7th Indictment ¶ 87-88, *U.S. v. Rhodes*,

21cr00015 ECF-1  ¶ 9).  It is not alleged that either entered during an ongoing event.  (*See Id.*).

Depending on the individual, each Oath Keeper would show that they sought to protect

and provide security as volunteers for others - not to attack Congress or stop any alleged

proceedings.  The very mission of the organization is to follow the law as they set forth in or

about 2018: 'Short of being called upon by the President, governor, local Sheriff, or to provide

disaster relief, members will be trained to serve as volunteer security for local events, churches

and effective neighborhood watches for their communities.'

The very interference of the Committee potentially with the Department of Justice is

evidenced by a tweet on April 8, 2022 from Politico's Kyle Cheney, which makes clear that

there is *exculpatory evidence* that the Committee has.   Ali Alexander states:

> '**I have fully complied with a subpoena by the Democrats' January 6
> Committee and testified under oath for 8 hours**. I did not finance the Ellipse
> Equipment.  I did not ever talk with the White House about security groups.  Any
> **militia working security** at the Ellipse **belonged to "Women for America First,"**
> not us. … **I did take Oath Keepers offer to act as ushers for the Area 8 event**
> but all of that was lost in the chaos." [16]

Defendants carefully recount many of the allegations in the government's criminal case

against the Plaintiffs  (defendants in the criminal action pending in the JUDICIAL BRANCH),

including the Allegation that "*According to the United States' filings in his pending criminal*

---

[16] (2) Kyle Cheney on Twitter: "CONFIRMED: Stop the Steal founder Ali Alexander says he's cooperating with the Justice Department after receiving a grand jury subpoena related to the Jan. 6 rally on the ellipse. His lengthy statement. More details TK >>> https://t.co/uzSGYShdn5" / Twitter (emphasis added).

*case, Kelly Meggs "plotted with his co-conspirators to stop the certification of the Electoral College vote, prepared to use violence if necessary, and stormed the Capitol. And he was the 'team leader' of the attack."* Gov't Opp'n to Def.'s Renewed Req. for Pretrial Release at 1, USA v. Meggs, No. 1:21-cr-00028 (D.D.C. March 23, 2021), ECF 98 (Gov't Opp'n).

The Indictment fails to recognize, in its allegations of theoretical conspiracy, is what the Committee has acquired exculpatory evidence of – that Defendants' traveled to Washington to provide protection services, volunteer protective services.  This exculpatory evidence shows that the Oath Keepers as a group, had a reason to be at the Ellipse, 'provided security for "security at the Ellipse belonged to "Women for America First"' and "**I did take Oath Keepers offer to act as ushers for the Area 8 event"** – "to escort people up towards the Capitol", when the chaos broke out.  This implies that the organizers would have had the members of the Oath Keepers, names listed ahead of time as anticipated providers of security.   This evidence is relevant to the core of the allegations related to conspiracy because it goes to focal point of when did the alleged conspiracy begin– when these Plaintiffs / criminal defendants can be shown to have come to Washington for perfectly legitimate purposes.

Plaintiffs had a very good reason to be in Washington on January 6th - other than to "attack the Capitol" – activity protected by the First Amendment, and that becomes exculpatory, and ignored by the government.  It shows they had a genuine purpose to wear protective gear and to be at the Ellipse and even in Area 8.   The evidence, however, that the Committee takes in secret, hidden from the Plaintiffs is crucial to their criminal defense, which shows the Committee's work, and its subpoena, is based on unauthorized activity by the Select Committee – a Criminal investigation, for all of the reasons set forth below.

The Rules of Federal Criminal Procedure embody a fundamental premise, 'ordinary equal protection.'  FRCP Rule 12(b)(3)(A)(iv) recognizes the fundamental right to file a motion to dismiss for '*a defect in instituting the prosecution*.'   This is because the entirety of the Rules of Federal Criminal Procedure embody constitutional protections.  The Select Committee's investigation of January 6, 2021 is not subject to the same rules.

### III.   <u>INTRODUCTION</u>

In the Subpoena at issue the Select Committee wants Verizon to release phone data during the dates of <u>November 1, 2020 to January 31, 2021</u> on Mrs. Meggs' Verizon account, to include all users, including Mr. Meggs and her children. On December 15, 2021, the Select Committee issued the Subpoena to Verizon requiring Verizon to provide the following information related to Ms. Meggs' cellular telephone number and account for the period of **<u>November 1, 2020, through January 31, 2021</u>**, which phone is used by Mrs. Meggs and her family plan.  The Subpoena seeks:

<u>Subscriber Information</u>: All subscriber information for the Phone Number, including:

a.  Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

b.   All authorized users on the associated account;

c.  All phone numbers associated with the account;

d.  Length of service (including start date) and types of service utilized;

e.  Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEI"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identifiers ("IMEI") associated with the accounts;

f.  Activation date and termination date of each device associated with the account;

     g.   Any and all number and/or account number changes prior to and after the account was activated;

     h.   Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

**Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with Phone Numbers, including all phone numbers, IP addresses, or devices that communication with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.**

**(See Exhibit A, copy of Subpoena)**(emphasis added).

The Committee admits its *purpose* is to oversee and review other criminal investigations to include "evaluating evidence" of a "terrorist attack." H. Res. 503 (June 28, 2021)(117th Congress, First Session.)(emphasis added),lacking a nexus to a legitimate purpose constitutes an impermissible criminal investigation against these private individual Plaintiffs, who are criminal defendants.  Undisputedly, as set forth below, the Committee was not formed in accordance with its Resolution, as described in the Complaint. ¶ ¶ 68-72 (*citing* H. Res. 503 § 2(a)).  Speaker Pelosi did not appoint any of Minority Leader McCarthy's recommended minority members:   In a public statement, she acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision."[5]  The Defendants attempt to distinguish this significant discrepancy, but do not dispute that the Committee functions without any of the Minority Leaders' recommended appointees, and currently functions instead with 7 Democrats and 2 Republicans chosen by Speaker of the House.   (See Defs.' Mot. at pp. 6-7)[17].

---

[17] "… After the Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the Speaker named an additional Republican to the Select Committee. *See* Compl. ¶¶ 69-70.  [citation omitted].   Since then, the Select Committee has functioned with seven Democrats and two Republicans.

IV.     **LEGAL ARGUMENT**

In a nutshell, Defendants argue that the Committee has a valid legislative purpose and is validly constituted.  (ECF 34-1, Defs. Mot. at 8-13). This becomes central to the Defendants' Motion to Dismiss, because they effectively recognize that Plaintiffs, private citizens, criminally charged, have standing to seek Injunctive Relief.  They do not genuinely dispute the fact that Plaintiffs are subject to a Subpoena to Verizon that seeks private information from private defendants under criminal indictment, or even that these Defendants will face irreparable harm in the face of a disclosure.  (See 34-1, Defs. Mot. generally).  Instead they summarily submit that disclosure seeks information for Congress, and not to the public, and that the subpoena seeks data, not messages.  (See Defs. Mot. at p.19).

This representation is unfounded, the request, as stated above, includes "**All call, <u>message</u> (_<u>SMS & MMS</u>_), Internet Protocol ("IP"), _<u>and</u>_ data-connection detail records associated with Phone Numbers, including all phone numbers, IP addresses, or devices that communication with the Phone Number via delivered and undelivered inbound, outbound, and _routed calls, messages, voicemail, <u>and</u> data connections_.**"  (Ex. A.)The word data connections is not a qualifier but an "and," along with all routed calls, messages, voicemail.  It is not a narrow request explaining only data, however, even assuming arguendo, it remains an unauthorized request, as set forth below.

The Supreme Court explained that "[o]ur analysis must begin with the recognition that, where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat--for example, the

constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129, 127 S. Ct. 764, 772, 166 L. Ed. 2d 604, 616, (2007).

" [A] plaintiff has standing to sue for injunctive relief when there is a 'real or immediate threat' that the party will suffer an injury in the future." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (citation omitted).  The court further explained that "[t]here must be some connection between the plaintiff and the defendant that ' []differentiate[s]' the plaintiff so that his injury is not 'common to all members of the public.'" *Id.* at 654-655 (*citing United States v. Richardson*, 418 U.S. 166, 177, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (*quoting Ex parte Levitt*, 302 U.S. 633, 634, 58 S. Ct. 1, 82 L. Ed. 493 (1937)).  Unless the Meggs seek relief from this court, Verizon will produce their personal phone data and information pursuant to the Select Committee's Subpoena. (Attached as Ex. A, with redactions).

### a. LACK OF A LEGISLATIVE PURPOSE AND NEXUS

Even assuming that the Committee is entitled to obtain non-content call and message data, which Mrs. Meggs disputes below, and setting aside the Constitutional objections set forth below, the Special Committee must demonstrate that the information sought would further its legislative mission.  Secondly, the Select Committee has to establish a nexus as between the records sought and their valid legislative purpose.  In other words, even assuming their legislative purpose is valid, Defendants' do not set forth why the Meggs's phone records become relevant to that purpose.

The Supreme Court held, as a matter of law, that a Congressional Committee in seeking to enforce criminal contempt against a witness for failure to answer questions, failed to prove the pertinence to the subject matter under inquiry of the questions the petitioner refused to answer. *Deutch v. United States*, 367 U.S. 456, 471, 81 S. Ct. 1587, 1595, 6 L. Ed. 2d 963, 973, (1961). The Court found that the questions at issue did not have a sufficient nexus to the purpose of the Committee.

The Court in its decision explained that,

> "[w]e need not pursue the matter, however, because, in any event, it is clear that the Government at the trial failed to carry its burden of proving the pertinence of the questions. See Bowers v. United States, 92 U. S. App. D. C. 79, 202 F.2d 447, 452. The first step in proving that component of the offense was to show the subject of the subcommittee's inquiry."

Id. at 469 (*citing Wilkinson v. United States, 365 U.S., at 407*).

In *Bowers*, the Court of Appeals for the District of Columbia explained that '[t]he Supreme Court said 'a witness rightfully may refuse to answer * * * where the questions asked are not pertinent to the matter under inquiry.' *Bowers v. United States*, 202 F.2d 447, 448, (D.C. Cir. 1953)(*citing Sinclair v. United States,* 1929, 279 U.S. 263, 292, 49 S.Ct. 268, 271, 73 L.Ed. 692.)

It is difficult to see, and Defendants' do not submit, as to how Mrs. Meggs' and her family's private and personal telephone data and messages or information about their communications for more than two months prior to January 6, 2021, and nearly a month after that date have a nexus to any legislative purpose, as the Supreme Court has made clear that "[a] congressional subpoena is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress." *Trump v. Mazars USA*, LLP, 140 S. Ct. 2019, 2031-2032, 207 L. Ed. 2d 951, 964-965, (2020)(further citations omitted).(Court held that "it must "concern[ ] a subject on which legislation 'could be had…'); As in *Eastland*, whether Members are acting within the "legitimate legislative sphere" becomes the question. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 506, 95 S. Ct. 1813, 1823, 44 L. Ed. 2d 324, 338, (1975).

The Committee admits its "purpose" is to oversee and review other criminal investigations to include "evaluating evidence" of a "terrorist attack," terrorist attacks are defined in criminal codes[18], and fall under criminal investigation - which belongs to the states.  H. Res. 503 (June 28,

---

[18] For example, the jurisdiction of the District of Columbia has state law on the subject, as most states

2021)(117th Congress, First Session.)(emphasis added).[19]

Democrats in Congress created the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol pursuant to House Resolution 503 "to investigate" the "terrorist attack" and makes clear in the Resolution defining their purpose that it is merely doing a criminal investigation to include investigating to punish those investigated.

> The Select Committee does not have a right to criminally investigate. Congress may not issue a subpoena for the purpose of "law enforcement," because "those powers are assigned under our Constitution to the Executive and the Judiciary." … Congress has no "'general' power to inquire into private affairs and compel disclosures," *id*., at 173-174, 47 S. Ct. 319, 71 L. Ed. 580, and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U. S., at 200, 77 S. Ct. 1173, 1 L. Ed. 2d 1273, 76 Ohio Law Abs. 225. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id*., at 187, 77 S. Ct. 1173, 1 L. Ed. 2d 1273, 76 Ohio Law Abs. 225.

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031-2032, 207 L. Ed. 2d 951, 964-965, (2020).

In ruling that Gender Related Crimes could not be regulated by Congress, the Supreme Court made clear that Congress' jurisdiction has limits.

> **'Congress' role does not include criminal investigations or the regulation of violent crime.** '[In *Lopez*] [w]e rejected these "costs of crime" and "national productivity" arguments because they would permit Congress to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce."' *Id*. at 607 (*citing United States v. Lopez*, 514 U.S. at 568, 577-578 (KENNEDY, J., concurring); *United States v. Harris*, 106 U.S. at 635).

*United States v. Morrison*, 529 U.S. 598, 612-613, 120 S. Ct. 1740, 1751, 146 L. Ed. 2d 658, 672-673 (2000)(emphasis added).

---

do.  D.C. Code § 22-3152.

[19] https://rules.house.gov/sites/democrats.rules.house.gov/files/BILLS-117hres503ih.pdf

The Supreme Court in *United States v. Morrison*, found that:

> "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under these theories . . . , **it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate."** ***Ibid.*** With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature. See, e.g., id., at 559-560, and the cases cited therein.

*Morrison*, 529 U.S. at 612-613, 120 S. Ct. at 1751, 146 L. Ed. 2d at 672-673 (emphasis added)[20].

Herein, addressing actions that have been charged by the government as criminal reflects Congress wading into criminal law and violence is specifically not Congress' to legislate because it belongs to the states, and to the Judiciary.

> Relatedly "**Congress may not issue a subpoena for the purpose of 'law enforcement,' because 'those powers are assigned under our Constitution to the Executive and the Judiciary**.'" *Mazars*, 140 S. Ct. at 2032 (*quoting Quinn v. United States*, 349 U.S. 155, 161, 75 S. Ct. 668, 99 L. Ed. 964 (1955)). Likewise, "there is no congressional power to expose for the sake of exposure." *Watkins*, 345 U.S. at 200.

---

[20] Similarly, the Court further upheld the unconstitutional infringement of intruding upon a state's criminal jurisdiction when it found that the federal act, *the Chemical Weapons Convention Implementation Act* could not apply to a local crime. *See Bond v. United States*, 572 U.S. 844, 134 S. Ct. 2077, 189 L. Ed. 2d 1, (2014) (emphasis added).

*Trump v. Thompson*, 2021 U.S. App. LEXIS 36315, (cited by Defendants, *Trump v. Thompson*, 20 F. 4th 10, 41).

In the stated in its RESOLUTION: SECTION 1. ESTABLISHMENT.

There is hereby established the Select Committee to Investigate the January 6th Attack on the United States Capitol (hereinafter referred to as the ''Select Committee'').

Nevertheless, Section 3 of the House Resolution, where the Committee addresses its very purpose shows that Congress is attempting to invade the criminal investigation and violence once again:

Consistent with the functions described in section 4, the purposes of the Select Committee are the following:

(1) **To investigate and report** upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (**hereafter referred to as the "domestic terrorist attack on the Capitol"**) and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the **United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented <u>such an attack</u>** on American representative democracy while engaged in a constitutional process.
(2) **To examine and evaluate evidence** developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the **domestic terrorist attack** on the Capitol and **targeted violence** and domestic terrorism relevant to such **terrorist attack**.
(3) **To build upon the investigations** of other entities and avoid unnecessary duplication of efforts by **reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack** on the Capitol, **including investigations** into influencing factors related to such attack.

H. Res. 503, *supra*, (emphasis added).[21]

---

[21] https://rules.house.gov/sites/democrats.rules.house.gov/files/BILLS-117hres503ih.pdf

And Congressman Adam Schiff, a member of the Committee, revealed on national television recently that, "all [the Committee] can do is expose all the malefactors, follow the evidence, wherever it leads, tell the American people the story of what went into January 6th, all the planning that went into it, who was behind it in terms of the money."[22]  And Congressman Kinzinger recently admitted on live television that the Committee was engaged in a criminal investigation to determine whether laws were broken on January 6, 2021.[23]

Congress has not identified a clear legislative purpose, separate and apart form its failure to follow its own rules.  Even assuming arguendo that the Select Committee has and can establish a valid legislative purpose of the Select Committee, the Select Committee has to establish a nexus as between the records sought and their "valid legislative purpose."  In other words, even assuming their legislative purpose is valid, Defendants' do not set forth why the Meggs's phone records become relevant to that purpose.  'The Supreme Court said 'a witness rightfully may refuse to answer * * * where the questions asked are not pertinent to the matter under inquiry. '  *Bowers v. United States*, 202 F.2d 447, 448, (D.C. Cir. 1953)(*citing Sinclair v. United States,* 1929, 279 U.S. 263, 292, 49 S.Ct. 268, 271, 73 L.Ed. 692.'   The Select Committee has failed to show pertinence as to the records it seeks from private individuals facing criminal court in the District of Columbia, and imminent harm.

---

[22] Late Night with Seth Meyers, Rep. Adam Schiff Says It Was Torture Listening to Kevin McCarthy's Speech, YouTube (Nov. 22, 2021), https://www.youtube.com/watch?v=mPvKNFC615o.

[23] ABC News, 'This Week' Transcript 12-19-21: Dr. Anthony Fauci & Rep. Adam Kinzinger, ABC News (Dec. 19, 2021), https://abcnews.go.com/Politics/week-transcript-12-12-21-dr-anthony-fauci/story?id=81833124; CNN Politics, Kinzinger says January 6 panel is investigating Trump's involvement in insurrection, Cable News Network (Dec. 19, 2021) https://www.cnn.com/2021/12/19/politics/adam-kinzinger-trump-investigation-insurrection-cnntv/index.html.

b. **THE FORMATION OF THE COMMITTEE IN VIOLATION OF ITS OWN RESOLUTION**

The Defendants attempt to hide the Violations of the Resolution that led to the Formation of the Select Committee by arguing that in *Trump v. Thompson*, the D.C. Circuit Court of Appeals already found a valid legislative purpose and that its inquiry concerns a subject on which legislation could be had *citing Trump v. Thompson.  Trump v. Thompson, 2021 U.S. App. LEXIS 36315, (cited by Defendants, Trump v. Thompson, 20 F. 4ᵗʰ 10, 41).* (Defs. Mot.  ECF 34-1, at p. 8-13).

The court of appeals in *Trump v. Thompson,* addressing the subpoena in that case, specific to the facts before the court, focused on a different predicated question of nexus between the purpose of the Committee and the request made; one that pertained to the executive privilege and the question of the privilege of a no-longer-sitting President contrasted with that of the incumbent President's position.  *Trump v. Thompson, 2021 U.S. App. LEXIS 36315, *53* (citing *Nixon v. GSA, 433 U.S. at 449)(*'In short, President Biden's considered judgment that the interests of the United States and the interests of the Executive Branch favor disclosure in this instance substantially "detracts from the weight of" former President Trump's contrary privilege contention.')  The D.C. Circuit, found that 'None of those tests, though, have been applied to resolve a privilege dispute between a former President and the joint judgment of the incumbent President and the Legislative Branch.'  *Id*.  The Defendants' counsel argued on appeal in that case, '*[t]he court concluded that Petitioner's assertion of executive privilege was "out-weighed by President Biden's decision not to uphold the privilege," and rejected Petitioner's invitation to "second guess that decision by undertaking a document-by-document review*." *Id*. at 102a. The court further determined that the Select Committee acted within its authority, rejecting

19

Petitioner's argument that the breadth of the request exceeded the Select Committee's need. *Id*.
at 113a, 116a.'[24]

Relevant to the questions in this case, in *Yellin*, the Supreme Court held that because the
Congressional committee that sanctioned the individual private plaintiff had failed to follow its
own rules in doing so, the Court would provide relief to an individual who had their rights
infringed upon by that committee. "…*[B]because of the view we take of the Committee's action,
which was at variance with its rules, we do not reach the constitutional questions raised.*" *Yellin
v. United States*, 374 U.S. 109, 111, 83 S. Ct. 1828, 1830, 10 L. Ed. 2d 778, 782, (1963). The
Court explained that '*[h]owever, when the application or construction of a rule directly affects
persons other than members of the house, "the question presented is of necessity a judicial one.*"'
*Id*. at 143 (*citing United States v. Smith*, 286 U.S. 6, 33);(*Christoffel v. United States*, 338 U.S.
84)(emphasis added).

Defendants rely on the Rulemaking Clause of the Constitution, but the Court of Appeals
for the District of Columbia Circuit explained that "[i]t is only when the challenge concerns a
Rule or the violation of a Rule that exceeds constitutional restraints that the issue may become
justiciable: imagine a Rule effectively circumscribing the right of Members from New York to
participate in House votes." *Rangel v. Boehner*, 20 F. Supp. 3d 148, 170, (D.C. Cir. 2013 ).  The

---

[24] Before the United States Supreme Court, Brief of Respondents Bennie G. Thompson and the
House of Representatives Select Committee to Investigate the January 6th Attack on the United
States Capitol in opposition filed at p. 12-13 *citing* to the District court and the Court of Appeals
for the D.C. Circuit.
https://www.supremecourt.gov/DocketPDF/21/21-
932/206949/20211230141540590_Trump%20v.%20Thompson%20brief%20in%20opposition%
20FINAL%20PDFA.pdf

court in that case further explains that there are many cases in which challenges to the discretion

under the Rulemaking Clause arise:

> Challenges to the exercise of discretion under the Rulemaking Clause have most frequently arisen in the context of criminal proceedings against individuals who testified before Congress. *See, e.g., Yellin*, 374 U.S. at 120-21 (in contempt proceeding, failure of committee to comply with certain committee rules was defense precluding prosecution); *Christoffel*, 338 U.S. at 88-90 (where House committee failed to maintain a quorum under committee rules, perjury conviction was not by "competent tribunal," and thus worked a denial of a fundamental right); *see Smith*, 286 U.S. at 33 ("As the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one."); *Metzenbaum*, 675 F.2d at 1287 ("[J]udicial intervention may be appropriate where rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures." *(citing Yellin*, 374 U.S. at 109)).
>
> In those cases, defendants identify either violations of Rules or the application of Rules that violated their rights during the course of their testimony. See, e.g., *Yellin*, 374 U.S. at 120-21; *Christoffel*, 338 U.S. at 88-89.
>
>  *Rangel v. Boehner* 20 F. Supp. 3d at 169.

While the deference on political questions, such as an issue between Presidents and a

potential connection to a legislative purpose, which may be non-justiciable, but these Plaintiffs,

who are criminal defendants, seeks declaratory relief and injunctive relief to protect their

constitutional right to a criminal investigation that follows the rules of Criminal Procedure and

the Sixth Amendment. *Id*. at 170.

The Defendants' argument seeking to rely on the Rulemaking Clause creates a false

predicate to the Committee, because it the Committee that it is interfering with a co-equal branch

of the government, the judiciary, and the fundamental rights built into the Rules of Criminal

Procedure, in its criminal investigations of these Plaintiffs, that the Committee should defer to

the prosecution by the Department of Justice on their behalf.

The Supreme Court in *United States v. Ballin*, 144 U.S. 1, 12 S. Ct. 507, 36 L. Ed. 321 (1892), made plain that our scope of review is broader than the district court believed. The Court expressly weighed the constitutional "validity" of a House rule involving when a sufficient quorum was present. In doing so, the Court indicated that our review of congressional rules is to be equally deferential, but no more so, than our review of most other legislative actions: 'The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained…'

*Vander Jagt v. O'Neill*, 699 F.2d 1166, 1172, (D.C. Cir. 1982)(citing *United States v. Ballin*, 144 U.S. 1, 5, 12 S. Ct. 507, 509, 36 L. Ed. 321 (1892)).

Reflective of the injection into the area of criminal law that belongs to the states, in seeking to subpoena for the Meggs' phone records, and data related thereto, the Committee is directly interfering with the Judicial Branch. This violates the Separations of Powers, wherein Mr. and Mrs. Meggs are scheduled for criminal trials on felony criminal charges under the Sixth Amendment. The Select Committee is seeking her and family's personal phone data in the same jurisdiction at the same time as where she is to have a 'fair trial' would be highly prejudicial. Clearly it is Congress that lacks the legitimate authority to pursue this Investigation that violates these Plaintiffs' constitutional rights.

'Congress's power to investigate has limits, however, because it is "justified solely as an adjunct to the legislative process[,]" *Watkins*, 354 U.S. at 197, "a congressional subpoena is valid only if it is 'related to, and in furtherance of, a legitimate task of Congress[,]'" *Mazars*, 140 S. Ct. at 2031 (*quoting Watkins*, 354 U.S. at 187). That generally means it must "concern[] a subject on which 'legislation could be had.'" *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 506, 95 S. Ct. 1813, 44 L. Ed. 2d 324 (1975) (*quoting McGrain*, 273 U.S. at 177).'

*Trump v. Thompson*, 2021 U.S. App. LEXIS 36315, *26-27.

The Select Committee functions in violation of its own authorizing resolution, H. Res. 503. (See Compl. at ¶ 73).

The Resolution that led to the formation of the Selection Committee stated[25]:

SEC. 2. COMPOSITION.
(a) **APPOINTMENT OF MEMBERS** .—The Speaker shall
appoint 13 Members to the Select Committee, **5 of whom
shall be appointed after consultation with the minority
leader.**
(b) D ESIGNATION OF CHAIR .—The Speaker shall
designate one Member to serve as chair of the Select Com-
mittee.
(c) **VACANCIES** .—**Any vacancy in the Select Com-
mittee shall be filled in the same manner as the original
appointment.**

And then the Speaker of the House gave this statement:

**JULY 21, 2021**

PRESS RELEASE

*Washington, D.C. – Speaker Nancy Pelosi released this statement on the
Republican recommendations to serve on the House Select Committee to
Investigate the January 6th Attack on the United States Capitol:*

"The violent domestic attack on Congress on January 6th was the worst
assault on the Capitol since the War of 1812 and the worst domestic assault
on American Democracy since the Civil War.  We are facing a radically
new threat in the kinds of forces that combined to attack our government on
January 6th.  The future of our democracy is on the line.  This assault was
an attempt to overthrow the government.

"We need a comprehensive investigation as to who organized this attack,
who paid for it, how they nearly succeeded in overthrowing a presidential
election, why they did it and how we must organize ourselves to prevent
anything like it from ever happening again.

"**It had been our hope to establish a bipartisan, independent National
Commission, but there is no prospect for that Commission at this time
because of insufficient support from Republican Senators.**  Therefore,
the House established the Select Committee to Investigate the January 6th
Attack on the U.S. Capitol.  The Select Committee on the January 6th
Insurrection will investigate and report upon the facts and causes of the
terrorist mob attack on the United States Capitol on January 6, 2021.  It will

---

[25] https://rules.house.gov/sites/democrats.rules.house.gov/files/BILLS-117hres503ih.pdf

also be charged with reporting its findings, conclusions and recommendations for preventing future attacks.

"Monday evening, the Minority Leader recommended 5 Members to serve on the Select Committee.  I have spoken with him this morning about the objections raised about Representatives Jim Banks and Jim Jordan and the impact their appointments may have on the integrity of the investigation.  I also informed him that I was prepared to appoint Representatives Rodney Davis, Kelly Armstrong and Troy Nehls, and requested that he recommend two other Members.

"With respect for the integrity of the investigation, with an insistence on the truth and with concern about statements made and actions taken by these Members, I must reject the recommendations of Representatives Banks and Jordan to the Select Committee.

"The unprecedented nature of January 6th demands this unprecedented decision."

*See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

Defendants in their Motion do not address the point that Plaintiffs made in the Complaint of the Speaker of the House's calling the Appointments "*unprecedented*."  *Id*.  Defendants instead try to argue the definition of "consultation"  to suggest "Consultation with the Minority Leader about 5 of the 13 Members of the Committee" means only "the act of asking," but not acting upon the advice or opinion of someone.  (Defs. Mot. at pp. 18-19 (citing Black's Law Dictionary (11th ed. 2019)).

House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503:  but Speaker Pelosi did not appoint any of Minority Leader McCarthy's recommended minority members.  The authorizing resolution instructs the Speaker **"shall"** appoint thirteen members, **5** of whom **shall** be appointed after consultation with the minority leader.. H. Res. 503 § 2(a).  (Compl. at ¶ 69.)  It does not say

"may" – it says "shall." In a public statement, the Speaker then acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision." (Compl. at ¶ 71.)

### c. THE SIXTH AMENDMENT RIGHT OF THE CRIMINAL DEFENDANT PLAINTIFFS

The trials are currently venued in the District of Columbia and where the court believes that a fair trial can still occur in this venue. The Subpoena seeks records that would provide data, information related to both Mrs. and Mr. Meggs' personal life over three months, and with whom each communicates. And as a fundamental matter, the Committee's Subpoena also seeks records pertaining to both of their activities while not present in the District of Columbia, activities unrelated to what they are under criminal indictment, and would capture communications that would include those between a private married couple. The Special Committee cannot demonstrate a compelling justification that would justify such an intrusion, and this Court should be particularly concerned when the records sought are those of a criminal defendant who is supposed to be able to have a fair trial in the same jurisdiction, Washington, D.C.

The Sixth Amendment has been upheld by courts to say it requires:

As a fundamental matter, "[w]e accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power -- to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge.

*Taylor v. Louisiana*, 419 U.S. 522, 530-531, 95 S. Ct. 692, 698, 42 L. Ed. 2d 690, 698, (1975)(citing *Duncan* v. *Louisiana*, 391 U.S., at 155-156).

This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

*Id.*

"Congress has no general power to inquire into private affairs and compel disclosures." *Trump v. Mazars*, 140 S. Ct. 2019, 2031 (2020) (remanding the D.C. Circuit's upholding of congressional subpoenas for President Trump's personal financial records to consider whether the information was available through other means, whether the subpoenas were sufficiently narrow, whether the subpoenas furthered, and the burden hat compliance would place on the President) *(quoting Watkins v. United States*, 354 U.S. 178 (1957) (internal quotations omitted) (reversing a Contempt of Congress conviction for refusing to answer questions about knowledge of Communist Party members)*(see also McGrain v. Daugherty*, 273 U.S. 135, 179 (1927)).

In the Speaker's Statement, without a trial, she pronounces definitively that "*January 6th [was an] **Insurrection** will investigate and report upon the facts and causes of the* "***terrorist mob attack***."[26]   Terrorism is actually defined by statute and is not factually supported regarding of the political wish that it were[27].  How is it a legitimate purpose of a partisan political committee formed

---

[26] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release)(emphasis added).

[27] DC law on terrorism which first requires a Specified Offense such as Murder, Kidnapping, Assault with the Intent to Kill only, Arson  or Malicious Destruction of Property that requires

without following its own rules using such political rhetoric at all justified for defendants who have not yet had their day in court?  The presumption of innocence before a trial appears to have disappeared for the purposes of political arguments.  18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

The Committee is repeatedly impacting defendants' right to a fair trial.  For example, the Committee through its investigation provided information it obtains through its contemporaneous investigation, on the individual named Ray Epps, before the Department of Justice made any specific production to any defendants.  The Committee issued its public statement, before the Department of Justice did, '"*We will" release the transcript of the interview with Epps, Jan. 6 Select Committee Chairman Bennie Thompson told the Washington Examiner Thursday. "But you know, there's a review process that goes with every deposition."*' [28]  The investigation of the

---

criminal intent to include Weapons of Mass Destruction, and/or including but not limited to, Biological Agents and Nuclear Material.  D.C. Code § 22-3152.  To argue it against the Meggs is simply inappropriate.  First, it is a criminal statute.  Secondly, there is no factual predicate.

[28] Kentucky Rep. Thomas Massie, Texas Sen. Ted Cruz, and Arkansas Sen. Tom Cotton questioned federal law enforcement officials about Epps during congressional hearings. The federal officials declined to answer questions about Epps or the involvement of federal agents, citing a long-standing policy to not comment on current investigations.

After senators brought Epps up in a hearing, a Jan. 6 committee spokesperson released a statement last week, saying Epps "informed us that he was not employed by, working with, or acting at the direction of any law enforcement agency on January 5th or 6th or at any other time and that he has never been an informant for the FBI or any other law enforcement agency."

Select committee member Rep. Adam Kinzinger, an Illinois Republican, said that Epps "didn't enter the Capitol on Jan. 6 and was removed from the most wanted list because, apparently, he broke no laws."

Committee which is duplicative and overlapping with the criminal investigation by the Department of Justice, reflects that any release of private information, whether through public statements by leadership or otherwise, released based on knowledge of information from the investigation, impacts the local jurisdiction and the jury pool within it, and these private defendants, charged in the place of the incident, for a criminal case.  Moreover, the issue of information obtained by the Select Committee that then constitutes exculpatory evidence to be disclosed to the Defendants.

The Select Committee is seeking information related to their right to a fair trial, but without the rules of procedure that are foundational in a U.S. District Court, such as the application of constitutional protections to accessing data <u>and</u> messaging on personal phones of private Plaintiffs.  Clearly any such records can be made public, disclosed information made available to residents of the District of Columbia, to the severe prejudice of Mrs. and Mr. Meggs' right to a fair trial.

### d.    <u>THE FIRST AMENDMENT</u>

Meanwhile, the Committee has pursued its concept of "domestic terrorism" and the crimes it wants to investigate as sounding in political free speech, the right peaceably to assemble, the right to petition the government for redress of grievances, and political organizing and association.  Within protestations that the Committee seeks to uncover crimes, in fact the focus is on silencing the First Amendment rights of U.S. citizens. Under the Select Committee's

---

*Ray Epps interview transcript with Jan. 6 panel to be public 'at some point,'* Emily Brooks, January 21, 2022, Washington Examiner:  https://www.washingtonexaminer.com/news/ray-epps-interview-transcript-with-jan-6-panel-to-be-public-at-some-point

Subpoena, the government intrusion into the communications of the Plaintiffs clearly implicates the First Amendment, which is so limited, would effectively be speech sponsored by the government and major corporations. See, e.g., *N.A.A.C.P. v. Alabama*, 357 U.S. 449 (1958). (Compl. at ¶ 125). Congress by definition would be investigating "political beliefs" as January 6th took place both at the Capitol, where politics are fundamental, and in relation to a Rally for the Incumbent President. (Compl. at ¶ 31).

Defendants further cite *Senate Permanent Subcommittee v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), aff'd, 856 F.3d 1080 (D.C. 2017), to argue that 'that this court has rejected claims that a Congressional subpoena violates a respondent's First Amendment rights.' (ECF 34-1, Defs. Mot. at p. 20). However, the court of appeals said in that case on appeal that,

> To be clear, we take no position on whether courts are powerless to enjoin individual members—or the committees of which they are a part—from disseminating investigative materials whose contents have no relationship to legislative functions or whose distribution would arguably violate the law. *See Watkins v. United States*, 354 U.S. 178, 187, 77 S. Ct. 1173, 1 L. Ed. 2d 1273, 76 Ohio Law Abs. 225 (1957) (investigative activities "must be related to, and in furtherance of, a legitimate task of the Congress"). That issue is not before us.
>
> *Senate Permanent Subcom. on Investigations v. Ferrer*, 856 F.3d 1080, 1087, 429 U.S.

App. D.C. 78, 85, (D.C. Cir. 2017).

Yet the First Amendment gives us a clear, bright-line way of evaluating to what extent the inquiry falls within a proper legislative purpose. Helpfully in this context, the First Amendment commands "Congress shall make no law…" on several topics. This makes it easy for us to decide whether the Committee's inquiry serves a valid legislative goal. If "Congress shall make no law" on a topic, we do not need to resort to subjective evaluation or balancing of interests or any difficult analyses. The Committee does not seem interested in the U.S. Capitol Police issuing six (6) permits for demonstrations to be held on the U.S. Capitol Grounds on January 6, 2021,

nor the lack of any signposts directing the crowds to the correct location for their permitted demonstration areas.  This is to say that the focus, in fact, as well as in law, of the Committee in its activity shows that the information sought is not related to a legitimate legislative purpose.

### e.  THE MARITAL COMMUNICATIONS PRIVILEGE

Also at issue in her and her husband's criminal actions, and highly prejudicial to Mrs. Meggs and her husband's criminal cases is that data reflecting communications on the subject phone numbers and users includes communications subject to the marital communications privilege, clearly to be violated by a subpoena that seeks three (3) months of information from the phone, from November 1, 2020 to January 31, 2021.

Defendants argue that 'Because the subpoena seeks only data, not the content of any utterances, any marital privilege does not apply to the subpoena here." (ECF 34-1 Defs.' Mem. at p. 18).  The subpoena however asks for all: <u>Connection Records and Records of Session Times and Durations</u>: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with Phone Numbers, including all phone numbers, IP addresses, or devices that communication with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, *messages*, *voicemail*, and data connections.  (See Ex. A).  Defendants cannot represent that in three months of communications that there are no communications whether messages or voicemails, etc., that are only between Husband and Wife.

The marital communications privilege covers "information privately disclosed between husband and wife in the confidence of the marital relationship." *SEC v. Lavin*, 111 F.3d 921, 925, (D.C. Cir. 1997); (s*ee also United States v. Brock*, 724 F.3d 817, 820-821, (7th Cir. 2013)(*citing*

*Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980).[29]  The Circuit Court of Appeals in *SEC v. Lavin* applied the marital communications privilege to a civil case, and explained how the Supreme Court in *Trammel*, "reaffirmed the significance of the confidential marital communications privilege and its important role in protecting the marital relationship, " "the best solace of human existence.' " *SEC v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997) (*citing Trammel v. United States*, 445 U.S. 40, 51 (*quoting Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 220-23, 10 L. Ed. 129 (1839)); see also 2 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE P 505[04] (1996)) (S*ee also, Blau v. United States*, 340 U.S. 332, 333, 95 L. Ed. 306, 71 S. Ct. 301 (1951); (*Wolfle v. United States*, 291 U.S. 7, 14, 78 L. Ed. 617, 54 S. Ct. 279 (1934)).

Defendants further argue that "the marital communications privilege does not apply to statements made in furtherance of joint criminal activity." *United States v. Marashi*, 913 F.2d 724, 731 (9th Cir. 1990).  Defendants make an argument without consideration of the again three months of communications are not alleged to be criminal in nature.  The Committee is attempting to presume the Meggs (as with others) guilty in advance as a way of presupposing without any grounds that a privilege does not apply.  The Seventh Circuit explained that "the spousal testimonial privilege [] prevents one spouse from being compelled to testify against the other in a criminal trial, and the marital communications privilege, [] protects both spouses against in-court disclosures of confidential statements made between them." *United States v. Brock*, 724 F.3d 817, 820, (7th Cir. 2013).

---

[29] 'The marital communications privilege can be asserted by either spouse: The marital communications privilege belongs to both spouses, so either spouse may invoke the privilege to avoid testifying or to prevent the other from testifying about the privileged communication.' *Brock*. at 820-821 (*citing United States v. Lea,* 249 F.3d 632, 641 (7th Cir. 2001)).

The Court of Appeals for the First Circuit rejected the government's argument of a "joint participant" exception on a criminal conspiracy charge upholding the marital privilege exception under FRE 501.  Id. at 24-25.

> By the Government's logic, the difficulties involved in prosecuting conspiracies would outweigh the significant countervailing interests that underlie a number of other evidentiary privileges as well, including, for example, the Fifth Amendment privilege against self-incrimination. 6 The Fifth Amendment, of course, is a constitutional right, and not just a matter of common law as is the spousal testimonial privilege. But given that both privileges are deeply rooted in history, the interests that underlie the spousal testimonial privilege are similarly significant.

*United States v. Pineda-Mateo*, 905 F.3d 13, 22-23, (1st Cir. 2018).[30]  The District of Columbia has a marital privileges statute protecting the communications privilege for both married individuals and domestic partnerships, with limited criminal exceptions for only cases such as to domestic violence, as in related to the home, and child abuse.[31]

### f.   THE FOURTH AMENDMENT

The subpoena unlawfully seeks information about both Mr. and Ms. Meggs' free speech and association activities that are protected by the First Amendment, and privacy under the 4th

---

[30] Other Circuits have similarly rejected this premise.  *In Appeal of Malfitano*, 633 F.2d 276 (3d Cir. 1980) and *In re Grand Jury Matter*, 673 F.2d 688 (3d Cir.), *cert. denied, sub nom. United States v. Doe*, 459 U.S. 1015, 74 L. Ed. 2d 509, 103 S. Ct. 375 (1982), the Third Circuit rejected the notion that where both spouses are allegedly involved in criminal activity the privilege against adverse spousal testimony does not apply.  *In re Grand Jury Subpoena Koecher*, 601 F. Supp. 385, 390, (S.D.N.Y 1984).

[31] D.C. Code § 14-306, in part:
(a) In civil and criminal proceedings, a spouse or domestic partner is competent but not compellable to testify for or against their spouse or domestic partner.
(b) In civil and criminal proceedings, a spouse or domestic partner is not competent to testify as to any confidential communications made by one to the other during the marriage or the domestic partnership.

Amendment against warrantless searches and seizures, and violates the Sixth Amendment in impacting her ability to get a fair trial in the District of Columbia.  Amendments I, IV and VI.

The Committee lacks a compelling interest in obtaining three months of Mr., Mrs. Meggs' and their children's' telephone data that detail communications about constitutionally protected activities, let alone her wholly unrelated private communications with friends, and relatives.  The Select Committee's Subpoena constitutes an unreasonable search and seizure, violates Mrs. Meggs' right to be secure in her person, papers, and effects under the Fourth Amendment of the United States Constitution.  Where an individual has a reasonable expectation of privacy, "official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."  *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018)(*citing Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

In *Carpenter*, the U.S. Supreme Court held that the government must obtain a warrant in order to obtain an individual's cell-site location information. In doing so, the Court declined to extend the reasoning of its earlier decisions in *Smith v. Maryland*, 442 U.S. 735, 740 (1979) and *United States v. Miller*, 425 U.S. 435 (1976) to the government's collection of cell-site location information. In *Carpenter*, the Court clarified noted the vast amount of information associated with modern communications and clarified that "[T]he fact that the government obtained the information from a third party does not overcome [a] claim to Fourth Amendment protection." *Id*. at 2219.  This Committee, however, is not required to follow the Rules of Criminal Procedure when collecting the information and data of private criminal defendants who are to be presumed innocent.

## g.  **THE SUBPOENA VIOLATES FEDERAL STATUTORY LAW**

The Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.,* prohibits an electronic service provider like Verizon from knowingly divulging "a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications …) to *any* governmental entity." 18 U.S.C. § 2702(a)(3).[32] The law provides specific exceptions that allow for the disclosure of non-content customer records under certain conditions, which includes where a "governmental entity" obtains a judicial warrant or "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena …".  18 U.S.C. §§ 2702(c)(1), 2703(c).[33]  A congressional subpoena is not on that list, it is specifically addressing judicial or administrative warrants and subpoenas.  In other words, Congress could have included Congressional Subpoenas but did not.

To assist this Court in evaluating what force to give the Act in this context, it should be noticed that the same Congress [34] which claims the power to subpoena these telecommunications records is also the Congress that enacted the statute that forbids it.  No exception in the statute applies to enable Congress to access these records.  By enacting 18 U.S.C. §§ 2701 *et seq.,* Congress limited itself as well as all others. [35]

---

[32]   The Stored Communications Act also prohibits the disclosure of the contents of communications. Given Committee Counsel's representation that it is not seeking that information, our discussion here is limited to the Act's provisions pertaining to non-content information.

[33] The statute defines the term "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof." 18 U.S.C. § 2711(4).

[34]    Meaning the branch of government, not a specific session of Congress.

[35]    That is, this is a much clearer case than in Congress asking for tax return information where the law – as the opposite posture – specifically allowed Congress to request tax information, and the question is are there limits to that empowerment.  Here, this is a much easier case where no such exception is provided.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Meggs respectfully request that this court not only deny the motion to dismiss, and grant declaratory relief, declare that the subject broad sweeping subpoena to Verizon by the Select Committee lacks a genuine legislative purpose, was issued from a Committee in violation of its own Resolution, and is enjoined because it violates Mr. and Mrs. Meggs' Constitutional rights of private individual criminal defendants including the First, Fourth and Sixth Amendments, the Marital Privileged Communications Privilege and statutory law.


Respectfully Submitted,



_____/s/ Juli Z. Haller_____
Juli Z. Haller, DC 466921
The Law Offices of Julia Haller
601 Pennsylvania Avenue, N.W.
S. Building, Suite 900
Washington, DC 20004
Telephone: (202) 729-2201
HallerJulia@outlook.com

*Counsel for Connie Meggs*